Tanya Sanerib (DDC Bar No. 473506)
Phone: (206) 379-7363
Email: tsanerib@biologicaldiversity.org
Sarah Uhlemann (WA Bar No. 41164)
Phone: (206) 327-2344
Email: suhlemann@biologicaldiversity.org
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
*Pro Hac Vice Applicants*

Laura Friend Smythe (DDC Bar No. NY0217)
Phone: (202) 676-2331
lsmythe@humanesociety.org
The Humane Society of the United States
1255 23rd Street, NW, Suite 450
Washington, DC 20037
*Pro Hac Vice Applicant*
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity; Humane Society International; the Humane Society of the United States; and Ian Michler, | **Case No. _____** |
| *Plaintiffs*, | |
| v. | **COMPLAINT** |
| David Bernhardt, in his official capacity as Secretary of the U.S. Department of the Interior; U.S. Department of the Interior; Aurelia Skipwith, in her official capacity as Director of the U.S. Fish and Wildlife Service; U.S. Fish and Wildlife Service, | |
| *Defendants*. | |

**INTRODUCTION**

1.      Africa's leopards, with their distinctive spotted coats, are both highly revered and heavily in demand in commercial trade and by trophy hunters. Due to the threat posed to the species from demand for leopard skins and other parts, leopards are protected under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an international agreement to which the United States is a party. CITES' strictest protections apply to leopards, meaning trade in their parts is "only to be authorized in exceptional circumstances." CITES, art. II, ¶ 1. Moreover, leopards are listed as threatened with extinction in most of Africa under the U.S. Endangered Species Act ("ESA").[1]

2.      In 2015, scientists determined that leopards in Africa (*Panthera pardus pardus*) have lost at least 30% of their habitat over the last 23 years. The assessment flagged that leopard populations in southern Africa are declining, especially in Zambia, Zimbabwe, Mozambique, and central Tanzania, and illegal killing, ceremonial use, and trophy hunting are ongoing threats to the species along with habitat loss and prey depletion. Indeed, the illegal skin trade in southern Africa is emerging as a significant threat to the species.

3.      Additionally, many countries exporting leopard trophies and parts—including Zimbabwe, Mozambique, Tanzania, and Zambia—do not know the size of their

---

[1] Leopards are listed as threatened under the ESA in Gabon, Congo, the Democratic Republic of the Congo (formerly, Zaire), Uganda, Kenya, and all countries to the south of these countries. 50 C.F.R. §§ 17.11, 17.40(f)(1). Leopards everywhere else are listed as endangered under the ESA.

leopard populations, how much potential habitat the cats occupy, whether that habitat has sufficient prey, what all the uses of the species are (including how many are killed in conflicts with people, by trophy hunters, by local hunters, by poachers for the skin trade or other ceremonial uses), or the cats' rate of natural births and mortalities.

4.     For decades, leopard trophy trade has been based on unjustifiably high export quotas for trophies (including skins) set at CITES Conferences of the Parties ("CoPs") for twelve African countries, including Zimbabwe, Mozambique, Tanzania, and Zambia. The quotas are based on arbitrary modeling that was later scientifically discredited, and this modeling led to the erroneous assumption that leopards were plentiful in Africa. Despite alarming projected leopard population declines and known significant habitat loss, parties to CITES recently sustained these quotas based on diplomatic negotiations, politics, and other factors divorced from strict conservation need and science.

5.     Even where, as here, politically motivated CITES quotas are insufficient to protect imperiled species, the U.S. Fish and Wildlife Service ("Service") has its own conservation mandates to uphold. Regulations implementing CITES in the United States are clear that, regardless of the unscientific export quotas being sustained, the Service has an independent obligation to undertake its own analysis to ensure leopards are not being overutilized. Yet, the Service has continued to authorize U.S. trophy hunters ("Applicants") to import **hundreds** of leopards killed every year in Zimbabwe, Mozambique, Tanzania, and Zambia. The Service authorizes these imports without sufficient information on, and without consideration of, the status of leopards in these

3

1   countries and the myriad human-caused mortalities and uses of these rare cats. The

2   Service must have sufficient information on the uses of a species and its conservation

3   status to ensure that imports will not be detrimental to the species. This includes

4   consideration of the overutilization and impeded recovery of, and the net harm to, the

5   species and the viability and increased risk of extinction at the national and local

6   population level. In considering these factors and authorizing any leopard trophy imports,

7   the agency must use the best available biological information. Absent this consideration

8   and information, the agency's regulations mandate that it must take precaution and

9   decline to authorize imports of leopard trophies.

10      6.      Therefore, Plaintiffs—conservation and animal welfare organizations and

11   an Africa-based safari operator with vested personal and financial interests in protecting

12   and enjoying wild African leopards—seek judicial review of certain authorizations the

13   Service made for leopard trophy imports from Zimbabwe, Mozambique, Tanzania, and

14   Zambia. In making these decisions, the agency acted arbitrarily, capriciously, and

15   contrary to its own regulations and the Administrative Procedure Act, 5 U.S.C.

16   § 706(2)(A). Plaintiffs request that the Court declare these authorizations are unlawful,

17   set them aside, and grant Plaintiffs their fees, costs, and such other relief as is necessary.

18                          **JURISDICTION AND VENUE**

19      7.      This action arises under the Administrative Procedure Act, 5 U.S.C.

20   §§ 551-559, 701-706.

21      8.      This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702

22   (Administrative Procedure Act), 28 U.S.C. §§ 1331 (federal question), and 1346 (actions

1    against the United States). This Court may grant declaratory relief pursuant to 28 U.S.C.

2    §§ 2201-2202.

3         9.      Venue is proper in the District of Arizona under 28 U.S.C. § 1391(e)

4    because this is an action against agencies and officers of the United States and Plaintiff

5    Center for Biological Diversity maintains its principal place of business in this judicial

6    district.

7         10.     Assignment of this case to the Tucson Division of this Court is appropriate

8    because Plaintiff Center for Biological Diversity has its principal place of business in

9    Pima County. LR Civ 77.1(a), (c).

10                                    **PARTIES**

11        11.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a

12   nonprofit Internal Revenue Service Code 501(c)(3) corporation that works through

13   science, law, and policy to secure a future for all species, great and small, hovering on the

14   brink of extinction. The Center is actively involved in species and habitat preservation

15   issues and has more than 68,000 members throughout the United States and the world

16   and more than one million online supporters. The Center is headquartered in Tucson,

17   Arizona, with offices in Washington, D.C.; San Francisco, Joshua Tree, and Los Angeles,

18   California; Richmond, Vermont; Minneapolis and Duluth, Minnesota; and Seattle,

19   Washington. The Center brings this action on behalf of its members who derive

20   scientific, aesthetic, recreational, and spiritual benefits from leopards and their habitat.

21   The Center advocates on the federal level for increased protections for African leopards,

22   including a pending petition to list all leopards as endangered throughout their range and

to increase protections for leopards to be imported as hunting trophies. The Center has also worked internationally to help garner support for listing leopards under the Convention on Migratory Species and supported the African Carnivore Initiative. At CITES CoPs and other CITES meetings, the Center has worked as an observer to advocate for scientifically sound leopard export quotas and to ensure species listed on Appendix I of CITES are adequately protected. The Center also works to curtail the trophy hunting of species threatened with extinction by petitioning for domestic Endangered Species Act protections for species and through advocacy before federal agencies, among other actions.

12.    Plaintiff HUMANE SOCIETY INTERNATIONAL ("HSI") is a global non-profit organization, headquartered in Washington, D.C., with office and programs around the world. HSI works to protect animals from abuse, including wildlife trafficking and trophy hunting, and has expended substantial organizational resources advocating for increased international and domestic legal protections of African leopards. For example, HSI submitted a petition to increase U.S. protections for leopards, especially those killed and imported as hunting trophies. HSI actively advocates at the state, federal, foreign, and international level against unsustainable trade in wildlife parts and products and regularly monitors the import and export of wildlife specimens, including hunting trophies of leopards and other African wildlife species. As a CITES observer, HSI works to ensure that leopard trophy export quotas are scientifically based and that bones of leopards and other big cats do not enter commercial trade to supplement trafficking in tiger bones. HSI also advocates for the improvement of management and protections of

leopards and other wildlife species in range states. For example, HSI provides comments and other input to the government of South Africa regarding that country's setting of leopard hunting quotas, review of leopard populations and trade information, and process for managing so-called "problem" leopards. The recreational killing of leopards by hunters, including for import into the U.S., undermines these efforts by normalizing lethal activities and creating cascading obstacles for leopard conservation.

13.     Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS"), a non-profit organization headquartered in Washington, D.C., has worked for decades to improve the plight of African wildlife on behalf of its members who are personally vested in ensuring the continued survival of some of the world's most iconic imperiled species. For example, HSUS petitioned the Service to list African elephants, African lions, African leopards, and chimpanzees as endangered to curtail the import of hunting trophies and domestic trade in such wildlife, and has commented in opposition to hundreds of permit applications to import endangered species trophies from Africa and other regions or to kill endangered species in the U.S.

14.     Plaintiff IAN MICHLER has 30 years of experience working as a specialist guide, safari operator, environmental journalist, and ecotourism consultant across Africa. He is the principal partner and co-founder of Invent Africa, a company that provides wildlife viewing and photography safaris and other ecotourism opportunities in over fifteen African countries, including Zimbabwe, Zambia, Tanzania, and Mozambique. Mr. Michler personally guides and operates safaris in these and other countries to view leopards, elephants, lions, and other wildlife species for Invent Africa. He typically visits

these countries multiple times a year and saw leopards in Tanzania as recently as 2020.
Some of the specific areas that Mr. Michler visits are the same or close to areas from
which the Service has approved leopard trophy imports, such as Southern and Northern
Luangwa National Parks in Zambia (near the Chifunda Hunting Block, from which the
Service has approved at least one Applicant to import a trophy-hunted leopard) the
Selous Game Reserve in Tanzania (the same area from which the Service has approved at
least one Applicant to import a trophy-hunted leopard), and Serengeti National Park and
Ngorogoro Conservation Area in Tanzania (both bordering the Maswa Game Reserve,
from which at least one Applicant is seeking to import a trophy-hunted leopard). He is
actively involved in several global conservation initiatives aimed at conserving African
wildlife and his guiding experience includes big game, birding, conservation,
photographic, cultural, and adventure safaris. Mr. Michler is also a member of the
International League of Conservation Writers, and much of his professional and
recreational writing focuses on the topic of conservation of big cats in Africa and the
unsustainability of trophy hunting. Mr. Michler's aesthetic, recreational, and financial
interests are being and will continue to be harmed by the Service's decisions to allow
U.S. hunters to import leopards as trophies from Zimbabwe, Zambia, Mozambique, and
Tanzania because these decisions are resulting in an increase of leopards being killed for
recreational purposes, putting unsustainable pressure on these imperiled populations, and
diminishing Mr. Michler's ability to enjoy observing leopards and deriving income from
them as part of his ecotourism business.

15.     Plaintiffs' and their members' interests are being and will continue to be concretely harmed by Defendants' decisions to allow imports of leopard hunting trophies from Zimbabwe, Zambia, Tanzania, and Mozambique. Plaintiffs and their members devote substantial recreational time to viewing, enjoying, studying, and photographing leopards in these countries, including some of the same areas from which the Service has authorized Applicants to import trophies in paragraphs 257 to 269. The interests of Plaintiffs and their members are threatened by the Service's decisions, which increase the number of leopards being killed for recreational purposes, decrease leopard abundance, in many instances put unsustainable pressure on these imperiled populations, and diminish Plaintiffs' and their members' ability to enjoy these majestic animals in the wild.

16.     For example, HSUS member and HSI employee Iris Ho has devoted her career to protecting and conserving foreign wildlife, such as leopards, from unsustainable trophy hunting and other threats to the species. In addition to her work with HSI, she serves on the board of directors for a wildlife conservation organization in Tanzania. She has also worked closely for many years with a non-profit organization that leads philanthropic wildlife viewing safaris in the Luangwa Valley in South Luangwa National Park in Zambia to secure, enforce, and implement protections against wildlife trafficking. Ms. Ho visited Tanzania and Zambia several times from 2017 through 2020, where she went on wildlife viewing safaris to see leopards and other species. Ms. Ho has personally viewed wild leopards in South Luangwa National Park in Zambia (in the same region of Zambia as the Chifunda Hunting Block, from which the Service has approved at least one Applicant to import a trophy-hunted leopard) the Selous Game Reserve in Tanzania (the

same area in Tanzania from which at least one Applicant is seeking to import a trophy-hunted leopard), and Serengeti National Park and Ngorogoro Conservation Area in Tanzania (both bordering the Maswa Game Reserve, from which the Service has apparently approved at least one Applicant to import a trophy-hunted leopard). While Ms. Ho is not currently traveling internationally due to the COVID-19 pandemic, she has plans to return to both Tanzania and Zambia to view leopards in the wild once it is safe to travel again, likely in 2021. She plans to return to the Luangwa Valley region in Zambia and intends during one of her return trips to Tanzania to visit the Selous Game Reserve, Serengeti National Park, and Ngorongoro Conservation Area again. The Service's actions therefore directly imperil Ms. Ho's interests in viewing and enjoying leopards.

17.    HSUS member and "district leader"[2] Heidi Osterman visits Zambia regularly, in part due to her significant volunteer work for a philanthropic conservation organization that leads wildlife viewing safaris in South Luangwa National Park and provides conservation education to the public as well as water to communities surrounding the park. She has also participated in observing and tracking collared animals with an organization in Zambia dedicated to monitoring and conserving leopards and other native large carnivores. Ms. Osterman and her husband financially sponsor two rangers who protects leopards and other wildlife from poachers and wildlife trafficking in Zambia. Ms. Osterman has seen leopards several times on her past safaris in South

[2] A "district leader" is a volunteer who lobbies on behalf of HSUS at the federal, state, and local levels to secure stronger protections for wildlife and other animals and receives targeted information and training to advocate on issues of interest to HSUS.

Luangwa National Park (the same region of Zambia as the Chifunda Hunting Block, from which the Service has approved at least one Applicant to import a trophy-hunted leopard) and it is one of the species she most enjoys seeing in the wild. She plans to continue to return to the same region of Zambia to view leopards and other wildlife and has already made plans to travel to this area of the country for a ten-night safari scheduled to begin on February 26, 2021. Ms. Osterman also provided testimony to the Service several times in her individual capacity to advocate for stronger action to curb international wildlife trafficking.

18.     By way of another example, Center employee Brett Hartl is a biologist and amateur naturalist who enjoys observing, photographing, and filming wildlife and their habitat around the world. Mr. Hartl enjoys viewing leopards and has captured detailed photographs of them in Uganda, Tanzania, and Namibia as well as in Asia. Mr. Hartl first visited Africa in 2010 on a two-week safari in Tanzania where he visited Serengeti National Park, the Ngorogoro Conservation Area and other national parks and became enchanted with the continent and its wildlife. He returned in 2015 on a trip to southern Africa, visited Ghana in 2017, and Uganda in 2018. In 2019, he visited Kenya and the Central African Republic. In 2021, conditions surrounding the current pandemic permitting, Mr. Hartl plans to return to South Africa, and circumstances allowing he plans to visit Zambia and cross over to Zimbabwe. In 2023 he plans to return to Tanzania and visit new areas including the Selous Game Reserve (the same area in Tanzania from which the Service has approved at least one Applicant to import a trophy-hunted leopard) and Eastern Arc Mountains.

19.     The leopards to be imported under the Service's import decisions in paragraphs 257 to 269 had not been killed at the time the Applicants applied for those permits, nor at the time the Service made those import decisions.

20.     On information and belief, the Applicants would not kill the target leopards if the Service did not make positive decisions allowing them to import a leopard trophy into the U.S. But for the Service's positive decisions, the trophies resulting from hunts cannot be legally imported into the U.S., and Applicants apply for permits in advance of their hunts to ensure the opportunity to import trophies before they engage in the hunts.

21.     On information and belief, Applicants have not yet killed the target leopards due to travel restrictions and health concerns due to the current pandemic.

22.     Data from a recent five-year period revealed that the U.S. imported 1,116 leopard trophies from Zimbabwe, Mozambique, Tanzania, and Zambia. By directly causing a reduction in the number of leopards in the wild, the Service's import decisions, such as those in paragraphs 257 to 269, negatively impact Plaintiffs' and their members' interests and abilities to see, enjoy, photograph, and film these animals in their natural habitat. Plaintiffs and their members will be less likely to see a leopard in the wild as a result and will derive less enjoyment from their visits to leopard habitat.

23.     This diminished enjoyment of leopards is further hampered because Applicants' killing of the target leopards approved by the Service for import will also cause a decline in the leopard populations exceeding the number of individual animals removed for import into the U.S. trophy hunting frequently has localized effects causing significant population reductions or even local extirpation. Due to leopard biology and

social structure, the removal of male leopards by trophy hunters often leads to fighting and infanticide by remaining males. This effect from trophy hunting is additive to the killing of leopards due to conflicts with people with the net result being the death of multiple leopards, including cubs that could otherwise grow into reproductive females. These types of ecosystem-wide harms to leopards further impair Plaintiffs' aesthetic and recreational interests in leopards and their habitat. A decrease in the number of leopards in these and other countries also provide fewer opportunities for Mr. Michler to bring Invent Africa customers to view these animals and to advertise the ability to view them.

24.     As explained below in paragraphs 126 to 138, as an importer, the United States is a major global consumer of leopard trophies importing on average over 54% of all leopard trophies in trade. For decades the U.S. has allowed imports of one to two leopard hunting trophies a day on average. Given the significant volume of leopard trophies imported into the U.S., if U.S. imports were to decrease or halt, the number of leopards typically killed by U.S. trophy hunters and the related cascading impacts to leopard populations they cause would not likely be supplanted by hunters from other countries. This is due to the fact that the U.S. and the European Union ("EU") are the main importers of hunting trophies and there is no reason to believe that hunters from the U.S. are currently taking leopards that would otherwise be killed by EU hunters or vice versa. For example, after the U.S. restricted elephant trophy imports from Zimbabwe, the Service received information indicating a decline in trophy hunting related funds resulted while the restrictions were in place. This information demonstrates that hunters from other countries did not step in to take the elephants U.S. hunters would have otherwise

killed. The impacts caused by U.S. trophy hunters are unlikely to be supplanted by other causes of leopard death, as trophy hunting creates additive, rather than compensatory, mortalities.

25.    Plaintiffs and their members are also harmed because their enjoyment of leopards and their habitat is diminished by the presence of trophy hunters. Simply knowing leopards are being hunted in the area where Plaintiffs' members visit diminishes Plaintiffs' and their members' experiences of those areas, as does the fear of viewing those hunters' kills, pursuits, or remains from their hunts. As U.S. hunters are responsible for over half of the leopard hunts for trophy exports in these countries, their presence and impacts are significant.

26.    The relief sought in this Complaint would redress Plaintiffs' and their members' injuries by reducing the number of leopards killed for importation into the U.S. The relief sought would also remedy Plaintiffs' injuries by reducing the number of leopards killed incidentally by infanticide after male leopards are killed by U.S. trophy hunters. This reduction of leopard deaths would increase Plaintiffs' and their members' abilities to see, enjoy, and photograph leopards in the wild. Reducing U.S. trophy hunting of leopards, a likely result from the U.S. not authorizing imports, would also contribute to Plaintiffs' and their members overall enjoyment of their time looking for, observing, photographing, and filming leopards in Zimbabwe, Tanzania, Mozambique, and Zambia.

27.    The relief sought in this Complaint would also remedy Plaintiffs' injuries by eliminating the additional cascading effects to leopards of poor management practices that are fueled by the commercialization of the species for the benefit of U.S. trophy

hunters. The money paid by U.S. trophy hunters to kill imperiled leopards for import undermines the public perception that there is value in conserving leopards in-and-of-themselves, rather than requiring that the species' pay its way. Undermining the public perception that there is intrinsic value in conserving leopards impairs effective conservation programs for leopards. The funds from trophy hunting can also lead to political decisions to increase leopard offtake or authorize unsustainable practices and corruption can factor into permitting decisions as well. Consequently, the relief sought in this Complaint—which would set aside and halt importation permits—would further leopard conservation in countries visited by Plaintiffs' members and help to ameliorate their injuries.

28.     The relief sought in this Complaint would further redress Plaintiffs' injuries, as the Service's compliance with its regulations implementing CITES is likely to incentivize and force improvements in range countries' management of leopard populations. Countries desiring to export leopards to the U.S. would create comprehensive leopard management plans, undertake population monitoring, gather information on all uses of leopards, and be required to make other improvements in order to ensure their ability to export leopard trophies to the U.S. Better management of leopard populations by range countries would increase the number of leopards in the wild, improve our understanding of these rare cats, and increase Plaintiffs' and their members' abilities to see, enjoy, and photograph leopards in the wild when they visit those countries.

29.     Defendant DAVID BERNHARDT, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of CITES, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Bernhardt is sued in his official capacity.

30.     Defendant U.S. DEPARTMENT OF THE INTERIOR is an agency of the federal government that is authorized to administer and implement CITES.

31.     Defendant AURELIA SKIPWITH is the Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to enforce and implement CITES, and to ensure compliance with all other federal laws that apply to the Service. The Service has primary authority for day-to-day administration of CITES including housing the permitting authority as well as the Scientific Authority and Management Authority designated under CITES. Director Skipwith is sued in her official capacity.

32.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States and is responsible for administering CITES in the United States, including implementing the relevant permitting system for trade in CITES listed species. The Service's Division of Scientific Authority issued the non-detriment findings for the leopard trophy import permits being challenged in this case. The Service's Division of Management Authority Branch of Permits in Falls Church, Virginia issued the CITES permits, as approved by Service headquarters in Washington, D.C., being challenged in this case.

16

## STATUTORY AND REGULATORY BACKGROUND

### A. Convention on International Trade in Endangered Species

33.     The Convention on International Trade in Endangered Species of Fauna and Flora ("CITES" or "the Convention") is an international treaty governing trade in imperiled species of wildlife and plants. CITES, Mar. 3, 1973, 27 U.S.T. 1087. CITES recognizes that "wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international cooperation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id*., Preamble. There are now 183 signatories, or "Parties," to the Convention.

34.     To receive protection under CITES, species must be included on one of the three CITES Appendices, and each Appendix provides listed species varying degrees of protection.

35.     Specifically, species on Appendix I of CITES are "threatened with extinction" and receive the strongest protections. CITES, art. II, ¶ 1.

36.     CITES strictly bans all commercial, international trade in Appendix-I species, although non-commercial trade in scientific, zoological, and other specimens may still occur with proper permitting. CITES, art. III, ¶¶ 1-3.

37.     The CITES Parties typically treat the export and import of hunting trophies as non-commercial trade since the end use (for personal home display) is non-commercial, even though the nature of the transaction to acquire the specimen is commercial. 50 C.F.R. § 23.62(c)(1).

38.     Leopards are listed on CITES Appendix I.

17

**B. CITES Permitting for Appendix-I Species**

39.     CITES provides that "[t]rade in specimens of [Appendix-I] species must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances." CITES, art. II, ¶ 1.

40.     Thus, in order to trade in an Appendix-I species, CITES requires both an import permit from the country of import and an export permit from the exporting country. CITES, art. III, ¶¶ 2, 3.

41.     In order to manage this permitting, each Party to CITES must designate a Management Authority "competent to grant permits or certificates" on the Party's behalf and a Scientific Authority. CITES, art. IX, ¶ 1.

42.     The Parties to CITES have agreed through a Resolution that a Scientific Authority is to provide independent advice "on the issuance of permits" including for the import of species listed on Appendix I. CITES, *Designation and role of the Scientific Authorities*, Resolution Conf. 10.3.

43.     In the United States, both the Management Authority and the Scientific Authority are housed within the Department of the Interior's U.S. Fish and Wildlife Service. 16 U.S.C. § 1537a.

44.     An export permit for an Appendix-I specimen, including a leopard hunting trophy, requires the exporting country to find "the following conditions have been met:" (1) the Scientific Authority has concluded that "such export will not be detrimental to the survival of that species;" (2) the Management Authority is satisfied that specimen was

not taken "in contravention of the laws of that State for the protection of fauna and flora;" and (3) an import permit has been granted. CITES, art. III, ¶ 2.

45.     An import permit for an Appendix-I specimen, including a leopard trophy, "shall only be granted when the following conditions have been met:" (1) the Scientific Authority of the importing country has concluded that "the import will be for purposes which are not detrimental to the survival of the species involved;" and (2) the Management Authority is satisfied "that the specimen is not to be used for primarily commercial purposes." CITES, art. III, ¶ 3.

46.     The United States has further restricted leopard trophy imports to two per calendar year per hunter. 50 C.F.R. § 23.74(d)(1).

47.     To seek to import a CITES Appendix-I species, a permit applicant "must . . . follow the general permit procedures" established by the Service's regulations. 50 C.F.R. § 23.32(d).

48.     Pursuant to the Service's CITES permitting regulations, if the Service needs "additional information" it contacts the applicant, and if the applicant does "not provide the information within 45 calendar days, [the Service] will abandon [the] application." 50 C.F.R. § 23.32(f)(2).

49.     The Service's general permitting regulations only allow permit or renewal applicants or permittees to seek reconsideration of a permitting decision before the issuing officer. 50 C.F.R. § 13.29(a)-(b).

19

50.     Only those individuals who can seek reconsideration (e.g., applicants or permittees) are allowed to administratively appeal permitting decisions. 50 C.F.R. § 13.29(e).

51.     CITES import permits issued for specimens destined for the United States only last for one year. 50 C.F.R. § 23.54(b)(2).

**C. Non-Detriment Findings**

52.     The importing and exporting country's Scientific Authorities' finding that trade in an Appendix-I species "will not be detrimental to the survival of the species" is referred to as a "non-detriment finding."

53.     Non-detriment findings are the Scientific Authority's final decision in light of the best available biological information on whether the trade being proposed by the applicant is sustainable and not detrimental to the species' survival.

54.     To assist Parties in making non-detriment findings, the CITES Parties adopted a Resolution explaining the factors to consider in making such findings. CITES, *Non-detriment findings*, Resolution Conf. 16.7 (Rev. CoP17).

55.     Resolution Conf. 16.7 highlights the following components of making non-detriment findings:

a. "Scientific Authorities should consider the volume of legal and illegal trade (known, inferred, projected, estimated) relative to the vulnerability of the species";

b. "the implementation of adaptive management, including monitoring, is an important consideration in the making of a non-detriment finding";

       c.    "the non-detriment finding is based on" an assessment of the species'

biology, life history, range, population structure, status, trends, threats,

levels and patterns of harvest and mortality "from all sources combined,"

management measures, and compliance.

56.    As stated in a 2018 CITES scientific overview of the conservation status of African leopards with a focus on trophy hunting, "trade in species listed on Appendix I should only occur if it can be demonstrated to be of benefit to that species."

57.    In the United States, CITES is implemented by the Service pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1537a, 1538, and the Service's CITES regulations, 50 C.F.R. §§ 23.1-23.92.

58.    The Service's regulations governing the issuance of non-detriment findings identify activities that are "detrimental," including "unsustainable use and any activities that would pose a net harm to the status of the species" and "interference with recovery efforts" for species on Appendix I. 50 C.F.R. § 23.61(b).

59.    The regulations also specify that the Service "will consider whether" certain information and factors are met in making non-detriment findings. 50 C.F.R. § 23.61(c).

60.    The permit applicant must provide to the Service sufficient information for the Service to determine whether "removal of the animal" is "part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species." 50 C.F.R. § 23.61(c)(2).

61.     If no such plan "has been established," then the agency must determine whether the "removal" "would not contribute to the over-utilization of the species, considering both domestic and international uses." 50 C.F.R. § 23.61(c)(3).

62.     This analysis includes the consideration of the "[v]olume of legal trade" and the "[v]olume of illegal trade" in the species. 50 C.F.R. § 23.61(g)(5)-(6).

63.     The Service must consider whether the proposed activity poses no net harm to the status of the species in the wild. 50 C.F.R. § 23.61(c)(4).

64.     The Service must consider whether the proposed activity would not interfere with the recovery of the species. 50 C.F.R. § 23.61(e)(2).

65.     In making its findings, the Service must "base the non-detriment finding on the best available biological information." 50 C.F.R. § 23.61(f).

66.     Even when the Parties to CITES have set "an export quota" for an Appendix-I species, the Service must independently "consider the scientific and management basis of the quota together with the best available biological information" in making non-detriment findings. 50 C.F.R. § 23.61(h).

67.     When "insufficient information is available or the factors . . . are not satisfactorily addressed, [the Service] take[s] precautionary measures and would be unable to make the required finding of non-detriment." 50 C.F.R. § 23.61(f)(4).

68.     Non-detriment findings do not account for economic, socio-economic, or other similar factors.

1      **D. Endangered Species Act**

2      69.     The U.S. Endangered Species Act ("ESA") requires the Service to list

3   species as "endangered" or "threatened" that are in danger of extinction or likely to

4   become so due to habitat destruction, "overutilization" including for "recreational

5   purposes," and other factors. 16 U.S.C. §§ 1532(6), (20), 1533(a)(1).

6      70.     The Service listed specific leopard populations in Africa under the ESA as

7   a "threatened" species in 1982 after the entire species had previously been listed as

8   "endangered" due largely to the commercial fur or skin trade. 47 Fed. Reg. 4204 (Jan. 28,

9   1982). Plaintiffs the Center, HSUS, and HSI currently have a petition pending before the

10  Service to up-list leopards that are currently listed a threatened to endangered once again.

11     71.     Due to the Service's "special rule" for leopards, 50 C.F.R. § 17.40(f), the

12  import of threatened leopard hunting trophies does not require an ESA permit or for the

13  Service to make any findings under the ESA. Even under this rule, the Service must still

14  make a non-detriment finding consistent with its implementing regulations before it may

15  issue a leopard import permit under CITES. 50 C.F.R. §§ 17.40(f)(2), 23.61.

16     72.     For species listed on Appendix II of CITES, Congress amended the ESA to

17  clarify that, when making non-detriment findings for Appendix-II species, the Scientific

18  Authority shall rely upon the "best available biological information derived from

19  professionally accepted wildlife management practices; but is not required to make, or

20  require any State to make, estimates of population size." 16 U.S.C. § 1537a(c)(2). The

21  population size exemption in Section 1537a does not apply to determinations and advice

22  made for species listed on Appendix I of CITES.

### E. Administrative Procedure Act

73.     The Administrative Procedure Act ("APA") provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702.

74.     The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**FACTUAL BACKGROUND**

### A. Leopards (*Panthera pardus*)

75.     The iconic leopard is the smallest of the large cats in the genus *Panthera*. Leopards are best known for their spotted coat but are revered for their stealth and strength as a predator, as they are known to haul their prey into trees.



Photo by Heidi Osterman, South Luangwa National Park, Zambia 2016

76.     Leopards occupy habitat ranging from deserts to rainforests and grasslands and even some mountainous areas in between. The size of a leopard's range depends largely on the availability of prey and the structure of the habitat.

77.     Unlike many carnivores, leopards are known to persist outside of protected areas. But this persistence is based prey availability, presence of other predators, and human presence and disturbance. Thus, like many other species, leopards fare better in large, connected habitats.

78.     While leopards have a reputation as generalists in terms of their prey, leopards can become specialists.

79.     The leopard was once the most widely distributed wild cat in the world, occurring from Asia to Africa. The species could once be found from Korea through southeast Asia and the Middle East and throughout much of Africa.

80.     Today, leopard populations have been significantly reduced and leopards can no longer be found in large areas of their historical range.

81.     The International Union for the Conservation of Nature ("IUCN") considers there to be nine subspecies of leopards globally.

82.     In Africa, there is one subspecies of leopard: *Panthera pardus pardus* (the African leopard).

**B. Threats to Leopards in Africa (*Panthera pardus pardus*)**

83.     According to the IUCN, leopards are severely impacted by human persecution and conflict, habitat fragmentation, reduced prey availability, illegal trade, and trophy hunting. The IUCN assessed leopards as "vulnerable" to extinction in 2015.

### 1.  Conflict with Humans and Habitat Loss and Fragmentation

84.     Leopards fare best in large areas of unfragmented habitat. But as human populations grow, leopards and people come into contact, with frequently deadly results for leopards.

85.     The IUCN found that retaliatory killing of leopards for real or perceived threats to livestock, game framing, and similar resources is the greatest source of leopard deaths.

86.     Of these killings, a high percentage are not reported.

87.     Habitat loss is also a threat. The IUCN documented a 21% range loss in sub-Saharan Africa (i.e., Africa excluding north Africa) over the past 25 years.

88.     A 2016 study estimated that leopards in southern Africa lost between 28-51% of their range, and leopards in eastern Africa lost from 40-60% of their range.

89.     This habitat loss is anticipated to increase, as the IUCN documented a human population increase to 1.139 billion people in Africa from 1994 to 2014 and a predicted increase to over 2 billion people in sub-Saharan Africa by 2050. This population increase was accompanied by a 57% increase in agricultural land use from 1975 to 2000, which is also predicted to continue and result in ongoing habitat fragmentation.

### 2.  Loss of Prey

90.     As human populations increase, humans also reduce leopard prey.

91.     People are increasingly capturing wild animals, both legally and illegally, for meat as part of the "bushmeat" trade in which the meat is used both used locally as food and to supply high-end markets in urban areas.

92.     The IUCN identified the unsustainable bushmeat trade as "leading to collapses in prey populations across large parts of savanna Africa." The "commercialized bushmeat trade" has caused "an estimated 59% average decline in leopard prey populations across 78 protected areas in West, East and southern Africa between 1970 and 2005."

93.     Not only is an increasing human population competing with leopards for prey, but the snares set for bushmeat capture, wound, maim, and even kill unintended wildlife including leopards.

94.     Increased grazing of livestock is further diminishing habitat for prey species and contributing to prey and consequentially leopard declines.

**3.  Illegal Trade, Corruption, and Human Demand for Leopard Skins and Other Parts**

95.     Leopards are further threatened by human demand for leopard skins and other parts. This includes poaching to meet demand for leopard skins in Africa and for bones and other parts primarily in Asia.

96.     Specifically, in southern Africa, the IUCN documented rampant "illegal trade in leopard skins for cultural regalia" and estimates "that 4,500-7,000 leopards are harvested annually to fuel the demand for [l]eopards skins" by just one church in South

Africa. Other studies suggest an illegal trade of over 800 skins a year with demand at a single church reaching over 15,000 leopards.

97.     There are other such churches including in Eswatini (formerly known as Swaziland) and Zambia where similar demand for leopard skins exists. Around 85% of skins involved in this illegal trade are from outside South Africa including countries as far away as Zambia.

98.     The illegal leopard trade extends beyond southern Africa to the United States and the European Union. A recent analysis estimated that of 12,405 leopard specimens declared for import into the U.S., approximately 348 specimens were seized by U.S. officials. The study cautioned that the seizures represent the lower bound estimate of illegal leopard trade.

99.     Wildlife trafficking makes up the fourth largest black market in the world, behind only narcotics, weapons, and humans. Thus, where government corruption exists, so can illegal wildlife trade.

100.    Corruption is a concern in Mozambique, Tanzania, Zambia, and Zimbabwe. Transparency International quantifies perceived levels of public sector corruption globally on a scale of zero to 100, with zero as the most corrupt. In its most recent analysis from 2019, the organization found that Zimbabwe scored a 24, Mozambique scored a 26, Tanzania scored a 37, and Zambia scored a 34. Sub-Saharan Africa was the lowest-scoring region globally meaning regionally it has the most corruption.

101.    The likelihood of a country being able to strictly manage a hunting program is significantly diminished when corruption is a problem.

### 4. Negative Impacts from Leopard Trophy Hunting

102.    Trophy hunting of leopards occurs primarily in southern Africa including Zimbabwe, Zambia, Mozambique, Namibia, and previously in South Africa. Tanzania also permits trophy hunting of leopards.

103.    The IUCN recognized that "poorly managed trophy hunting adds to pressure on local leopard populations" and has stated, "[i]f poorly managed, trophy hunting can be detrimental to the population, especially when permits are focused in one geographic area and targeted individuals are in their prime, territorial, reproductively active."

104.    Excessive and unsustainable trophy hunting can render a population unviable or even lead to localized extinctions.

105.    Several nations have recently banned leopard trophy hunting, finding it unsustainable. In South Africa, unsustainability of leopard trophy hunting in at least two provinces led to a leopard trophy hunting ban in 2016. Leopard trophy hunting was "reviewed or closed in Namibia, Botswana, and Zambia" within the past decade.

106.    Beyond directly threatening specific populations, trophy hunting has other negative impacts on leopards.

107.    Thought to be largely solitary, there is evidence that male leopards engage in infanticide. This killing of a female's litter of cubs is largely driven by sexual selection (i.e., the male's desire to mate with the female). But this practice may increase to unsustainable levels when high levels of males are lost in the population. Solitary species,

29

1   like leopards, appear to be particularly sensitive to infanticide, because females cannot

2   rely on cooperative defense against incoming males.

3        108.    An artificial increase in turnover and immigration rates, such as that caused

4   by trophy hunting, increases contact between unfamiliar individuals and promotes

5   conflict between leopards.

6        109.    Scientists support limiting trophy hunting to males seven years or older to

7   reduce infanticide and to increase genetic diversity in leopard populations. In some

8   countries, such as Mozambique, a high percentage of leopards killed for trophies are

9   under the age of seven.

10       110.    Trophy hunting traditionally targets male leopards because they are larger

11   than females and thus are more desirable as trophies. Hunting of female leopards is

12   banned in most countries. But it is difficult to discern the sex of a leopard in the field and

13   as a result many females are killed by trophy hunters. For example, a study conducted in

14   Tanzania found that 27% of the 77 leopard trophies tested over a four-year period were

15   female.

16       111.    One metric used to establish sustainable killing is that only 3.6% of the

17   total population should be permitted to be killed a year. However, for this metric to be

18   effective, sound population estimates are required.

19       112.    Because leopard populations are generally not well known or monitored

20   especially at the national level and most estimates likely overestimate populations,

21   scientists recommend that quotas be set adaptively for specific sites based on long-term

22

monitoring of those sites and take into account of all forms of offtake or use of the species.

113.    Despite all the information compiled by the IUCN on leopards, the assessment still made clear that "[t]here are few reliable data on changes in the Leopard (*P. p. pardus*) status (distribution or abundance) throughout Africa over the last three generations, although there is compelling evidence that subpopulations have likely declined considerably."

114.    The IUCN found that "in southern Africa, the so-called stronghold of the leopard, there is no evidence to suggest that leopard populations have remained stable."

115.    Trophy hunting also can include practices such as baiting and hunting with dogs that ensure kills and can increase leopard mortality in those areas. For example, hunting leopards with dogs in Zimbabwe is a concern because it increases the ability of hunters to locate and kill leopards.

**C. CITES and Leopard Trophies**

116.    Under CITES, trade in Appendix-I species can only be authorized in extraordinary circumstances. In some cases, the Parties to the Convention expressly dictate through a resolution what trade is permissible. These restrictions are called Conference of the Parties ("CoP") set quotas.

117.    Currently twelve Parties to CITES are collectively approved to export 2,648 leopard skins annually under quotas approved at a CoP to CITES.[3] CITES, *Quotas for leopard hunting trophies and skins for personal use,* Resolution Conf. 10.14 (Rev. CoP16).

118.    These quotas were set originally based on modeling developed by Martin and de Meulenaer in 1988 that attempted to correlate leopard population numbers with rainfall.

119.    This model has since been heavily criticized by studies published in 1989, 1990, 2005, and thereafter for failing to address all forms of human caused mortality of leopards, failing to account for prey availability, and for including questionable assumptions. The population estimate based on this model is "considered an impossible overestimate" by these studies and by the IUCN.

120.    It is this vast population overestimation that served as the basis for the CITES leopard quotas.

121.    Among the twelve Parties with CoP-set quotas based on the arbitrary rainfall model are Mozambique, Tanzania, Zambia, and Zimbabwe.

122.    In 2016, South Africa suspended leopard trophy hunting after its Scientific Authority affirmed that "the number of leopards in the country was unknown and that trophy hunting posed a high risk to the survival of the species."

---

[3] Two Parties have requested that their leopard quotas be rescinded but those requests from Kenya and Malawi have not been acted upon at CITES. If granted, that would reduce the Parties to ten and the collective quota to 2,518.

123.    Thereafter, South Africa became the only country of the twelve with CoP-set quotas to implement a program to systematically monitor leopards and estimate the countrywide population. In 2018, South Africa's monitoring program revealed its leopard population was suffering "an 8% population decline per year" in what scientists thought was the species' southern stronghold.

124.    Despite South Africa having the only leopard monitoring program of the 12 countries with quotas, and despite the results of that program showing a population decline in what was thought to be a leopard stronghold, the Parties to CITES nevertheless approved maintaining the prior export quotas that were based upon the arbitrary and scientifically disproven rainfall model.

125.    This approval was based in part upon politics, negotiations, and not biological information and scientific data, which was largely absent from the deliberations.

**D. The Role of U.S. Trophy Hunters in the Leopard Trade**

126.    For decades, the U.S. has allowed imports of one to two leopard hunting trophies a day on average from countries in Africa.

127.    According to trade data collected by CITES from the most recent five-year period available (2014-2018), the United States imports over half of all leopard specimens traded globally as hunting trophies. Specifically, over these five years the United States imported on average 52% of all global leopard trophies. This includes trophies imported for personal or hunting trophy purposes and rugs, skins, and bodies imported for hunting trophy purposes.

33

128.   The U.S.' annual share of worldwide leopard trophy imports was 52% in 2014, 56% in 2015, 55% in 2016, 50% in 2017, and 48% in 2018 as depicted in the following graphic:



129.   Over the same five-year period, the U.S. imported at least 85 leopard trophies originating from Mozambique and on average brought in 36% of all the leopard trophies originating from Mozambique.

130.   Over the same five-year period, the U.S. imported at least 503 leopard trophies originating from Zimbabwe and on average brought in 64% of all the leopard trophies originating from Zimbabwe.

131.   Over the same five-year period, the U.S. imported at least 369 leopard trophies originating from Tanzania and on average brought in 49% of all the leopard trophies originating from Tanzania.

132.   Over the same five-year period, the U.S. imported at least 80 leopard trophies originating from Zambia and on average brought in 59% of all the leopard trophies originating from Zambia.

133.   Collectively from just these four countries over five years, the U.S. imported 1,037 leopard trophies. Despite the vast number of animals killed for trophies to import into the U.S., trophy hunters contribute comparatively little to the local economy. While overall tourism in African countries visited by trophy hunters is valued at between 2.8% and 5.1% of Gross Domestic Product ("GDP"), the total annual economic contribution of trophy hunters is at most an estimated 0.03% of GDP.

134.   Because CITES mandates the issuance of an import permit and a non-detriment finding from the importing country, the Service's Management and Scientific Authorities must determine whether or not a leopard shot and killed in Africa can be brought back to the U.S.

135.   Many U.S. trophy hunters apply for their import permits before they depart the United States to undertake a leopard hunt.

136.   A positive non-detriment finding and the grant of a related CITES import permit are prerequisites for many U.S. hunters to trophy hunt leopards.

137.   For example, U.S. trophy hunters have declared under penalty of perjury that if they are unable to import their trophies, they do not know if they will continue with a scheduled hunt.

138.   The Service states in its own guidance to leopard trophy hunters that "most hunters want to know before their hunt whether they qualify for a permit to import their hunted animal," and recommend submitting permit applications 18 months prior to a planned leopard hunt so that hunters can ensure they will be allowed to import the leopard before they kill it.

### E.  Leopard Trophy Hunting in Mozambique and U.S. Non-Detriment Findings

139.   Mozambique is a leopard range state located in southern Africa.

140.   A civil war ravaged the country from 1977 until 1992 and decimated many wildlife populations.

141.   Leopards are thought to occur only in certain regions in Mozambique.

142.   Mozambique's system of protected areas includes: "seven National Parks, eight National Reserves, 17 Forest Reserves, 20 official hunting reserves (coutadas) and two Community Conservation Programs."

143.   Despite numerous parks and reserves in Mozambique, only 14.6% of the leopard's range is estimated to be included in protected areas.

144.   Mozambique law requires a license to hunt wildlife, including the leopard.

145.   Mozambique has no management plan for leopards.

146.   Mozambique's leopard hunting quotas are set through negotiations between government officials and safari operators.

147.   The size of the leopard population in Mozambique is unknown and it offers only an unreliable estimate of leopard abundance.

148.   Mozambique relies upon the discredited rainfall model developed by Martin and de Meulenaer (1988) to estimate leopard abundance.

149.   Habitat was last assessed in Mozambique in 2015, and prey populations are not being systemically monitored.

150.   The Service has found that imports of leopard trophies from Mozambique are not detrimental.

36

151.    The non-detriment findings for leopard trophies from Mozambique do not contain a reliable population estimate based on population monitoring data.

152.    The non-detriment findings for leopard trophies from Mozambique do not consider other metrics to attempt to quantify the leopard population such as prey availability and assessment of the suitability of habitat for leopards.

153.    The non-detriment findings for leopard trophies from Mozambique do not contain an estimate of leopard range, if any, beyond protected areas in that country.

154.    The non-detriment findings for leopard trophies from Mozambique do not consider the status of the leopard population or other conditions in the specific area of the country where the leopard is to be killed for import.

155.    The threats to leopards in Mozambique include direct persecution due to human-wildlife conflict, indirect killings resulting from bushmeat snaring, and illegal killings for the skin trade.

156.    The non-detriment findings for leopard trophies from Mozambique do not consider the direct persecution of leopards in Mozambique due to human-wildlife conflict.

157.    The non-detriment findings for leopard trophies from Mozambique do not consider the number of leopards killed in snares set for bushmeat or how bushmeat snaring has impacted the suitability of habitat for leopards, for example, by depleting leopard prey.

158.    The non-detriment findings for leopard trophies from Mozambique do not consider natural mortality and the number of leopards lost each year to non-human caused deaths.

159.    The non-detriment findings for leopard trophies from Mozambique do not consider illegal trade and all uses of leopards both domestically and internationally.

160.    The non-detriment findings for leopard trophies from Mozambique do not consider that 240 leopards were reportedly killed in Mozambique over ten years due to persecution and that this number is likely a small part of the number of leopards actually killed because most wildlife killed due to human wildlife conflict is unreported.

161.    The non-detriment findings for leopard trophies from Mozambique do not consider the number of leopards poached for the illegal skin trade. For example, a study in one reserve found 20 leopards were killed annually over three years for the skin trade. Leopard skins originating from Mozambique have been seized in South Africa and this illegal trade in leopard skins in southern Africa is substantial.

162.    The non-detriment findings for leopard trophies from Mozambique do not consider that there is also domestic hunting of leopards by non-tourists or disclose the impacts from this use of leopards.

163.    The non-detriment findings for leopard trophies from Mozambique do not rely on the best available biological information. This information includes, for example:

      a.  Data, information, or studies on the loss and fragmentation of habitat in Mozambique;

b. Data, information, or studies on leopard prey declines and the bushmeat trade;

c. Studies, data, information, or annual reports on leopards killed by direct persecution due to human-wildlife conflict and any estimates of the percentage of deaths reported and the actual number of deaths those reported incidents represent;

d. Data, information, or studies on the illegal leopard skin trade in southern Africa and Mozambique's role in that trade;

e. Data, information, or studies on ceremonial and other domestic uses of leopards in Mozambique;

f. Data, information, or studies on trophy hunting and non-tourist hunting of leopards in Mozambique;

g. Recent population estimates for leopards in Mozambique; and

h. Data, information, or studies on natural mortality rates of leopards.

164. The Service had insufficient information on leopards in Mozambique upon which to consider whether leopard trophy hunting would contribute to the over-utilization of leopards.

165. The Service had insufficient information on leopards in Mozambique upon which to consider whether trophy hunting would pose a net harm to the status of the species in the wild.

166.    The Service had insufficient information on leopards in Mozambique upon which to consider whether leopard trophy hunting would cause long-term declines that would place the viability of the affected leopard population in question.

167.    The Service had insufficient information on leopards in Mozambique upon which to consider whether leopard trophy hunting would cause an increased risk of extinction to leopards as a whole or in the population from which the specimen was obtained.

168.    The Service had insufficient information on leopards in Mozambique upon which to consider whether leopard trophy hunting would interfere with the recovery of leopards.

169.    The Service had insufficient information on leopards in Mozambique upon which to determine that trophy hunting is not detrimental to the survival of the species.

**F.  Leopard Trophy Hunting in Zimbabwe and U.S. Non-Detriment Findings**

170.    Zimbabwe is a leopard range state located in southern Africa.

171.    In Zimbabwe it is illegal to hunt wildlife without a permit. However, because leopards are not specially protected animals, no increased penalties apply to illegal hunting of leopards.

172.    The Service recognizes that corruption and enforcement of wildlife laws are both concerns in Zimbabwe.

173.    Zimbabwe has no management plan for leopards.

174.    Zimbabwe has no formal criteria and is trialing age-based incentives for licensing trophy hunts and allocating quotas.

175.    Leopard quotas are negotiated through a participatory process between government officials, local communities, hunting operators, and non-governmental researchers.

176.    The size of the leopard population in Zimbabwe is unknown.

177.    Zimbabwe relies upon the discredited rainfall model developed by Martin and de Meulenaer (1988) to estimate leopard abundance.

178.    The Service recognizes "accurate and current population data is largely unavailable and effective trophy monitoring hasn't been established, in practice quotas are set based primarily on the opinions of stakeholders" with final approval by government officials.

179.    The Service has found that imports of leopard trophies from Zimbabwe are not detrimental.

180.    The non-detriment findings for leopard trophies from Zimbabwe do not contain a reliable population estimate based on population monitoring data.

181.    The non-detriment findings for leopard trophies from Zimbabwe do not consider other metrics to attempt to quantify the leopard population such as prey availability and assessment of the suitability of habitat for leopards.

182.    The non-detriment findings for leopard trophies from Zimbabwe do not consider the status of the leopard population or other conditions in the specific area of the country where the leopard is to be killed for import.

183.    The non-detriment findings for leopard trophies in Zimbabwe do not consider that hunters in Zimbabwe are able to hunt with dogs, which increases the ability

of hunters to locate and kill leopards and this success at hunting leopards can mask continued population decline.

184.    The threats to leopards in Zimbabwe are habitat loss and fragmentation, decreased prey, persecution from human-wildlife conflict, illegal trade, killing for ceremonial use, and poorly managed hunting.

185.    The non-detriment findings for leopard trophies from Zimbabwe recognizes the significant demand for leopard skins, which are traded illegally in southern Africa, that Zimbabwe lacks the financial resources to effective patrol protected areas to prevent poaching, and that hunting may have been permitted in national parks to raise funds. However, these ongoing threats to leopards are not considered in the findings.

186.    The non-detriment findings for leopard trophies from Zimbabwe do not consider domestic uses of leopards, including for ceremonial purposes.

187.    The non-detriment findings for leopard trophies from Zimbabwe do not consider Zimbabwe's national hunting quota, which is different from its CITES quota, may be set higher than the CITES quota, and includes hunting to address human-wildlife conflict in communal areas.

188.    The non-detriment findings for leopard trophies from Zimbabwe do not consider natural mortality and the number of leopards lost each year to non-human caused deaths.

189.    The non-detriment findings for leopard trophies from Zimbabwe do not consider legal and illegal trade and all uses of leopards both domestically and internationally.

42

190.    The non-detriment findings for leopard trophies from Zimbabwe recognize that habitat loss from development and conflicts with people is diminishing Zimbabwe's leopard population but the findings do not consider this decline.

191.    The non-detriment findings for leopard trophies from Zimbabwe recognize that persecution due to human-wildlife conflict, including through false reports of conflicts to attain hunting permits, is a threat but the findings do not consider the number of leopards lost to conflicts with people.

192.    The non-detriment findings for leopard trophies from Zimbabwe do not rely on the best available biological information. This information includes, for example:

  a.  Data, information, or studies on the loss and fragmentation of habitat in Zimbabwe;

  b.  Studies, data, information, or annual reports on leopards killed by direct persecution due to human-wildlife conflict and any estimates of the percentage of deaths reported and the actual number of deaths those reported incidents represent;

  c.  Data, information, or studies on the illegal leopard skin trade in southern Africa and Zimbabwe's role in that trade;

  d.  Data, information, or studies on ceremonial and other domestic uses of leopards in Zimbabwe;

  e.  Data or information on trophy hunting and non-tourist hunting of leopards in Zimbabwe;

  f.  Recent population estimates for leopards in Zimbabwe;

    g.  Studies on the impacts of the use of dogs to hunt leopards in Zimbabwe and related conservation concerns;

    h.  Data, information, or studies on leopard prey declines and the bushmeat trade; and

    i.  Data, information, or studies on natural mortality rates of leopards.

193.   The Service had insufficient information on the status of leopards in Zimbabwe upon which to consider whether trophy hunting would contribute to the over-utilization of leopards.

194.   The Service had insufficient information on leopards in Zimbabwe upon which to consider whether trophy hunting would pose a net harm to the status of the species in the wild.

195.   The Service had insufficient information on leopards in Zimbabwe upon which to consider whether leopard trophy hunting would cause long-term declines that would place the viability of the affected leopard population in question.

196.   The Service had insufficient information on leopards in Zimbabwe upon which to consider whether leopard trophy hunting would cause an increased risk of extinction to leopards as a whole or in the population from which the specimen was obtained.

197.   The Service had insufficient information on leopards in Zimbabwe upon which to consider whether trophy hunting would interfere with the recovery of the species.

198.    The Service had insufficient information on leopards in Zimbabwe upon which to determine that trophy hunting is not detrimental to the survival of the species.

**G. Leopard Trophy Hunting in Tanzania and U.S. Non-Detriment Findings**

199.    Tanzania is a leopard range state located in eastern Africa.

200.    Despite numerous the parks and reserves in Tanzania, only 23.9% of the leopard's range is estimated to be included in protected areas.

201.    Leopard quotas are set annually by government officials and select biologists based on information generated by researchers, government officials, and hunting operators.

202.    At least since 2010, scientists have acknowledged that excessive hunting is a factor driving leopard decline in Tanzania.

203.    Tanzania has a 2009 carnivore conservation action plan that pertains to leopards in Tanzania. According to the Service's non-detriment findings for Tanzania leopard imports, the carnivore conservation action plan for Tanzania identifies missing information that is needed on leopards in order to properly manage them.

204.    In lieu of wide-spread monitoring data, "camera trap" data from only 23 sites (only 19 of which captured any information on leopards) is used. Leopard density estimates from only four studies conducted in three different protected areas (a national park, two game reserves, and one game management area) have been made. No data have been collected on leopard abundance or density outside protected areas. The density estimates and camera trap data are nevertheless used to estimate the leopard population

throughout the entire country. Leopard density outside protected areas is estimated at one leopard per 100 km$^2$.

205.    Even using extrapolation and unreliable estimation methods, in 2018, Tanzania estimated the leopard population at a ten thousand leopard difference from the IUCN's big cat specialist group's 2017 estimate.

206.    Tanzania does not monitor leopard prey populations.

207.    Tanzania has a dated generic carnivore conservation plan from 2009 that pertains to leopards.

208.    The Service has found that imports of leopard trophies from Tanzania are not detrimental.

209.    The non-detriment findings for leopard trophies from Tanzania do not contain a reliable population estimate based on wide-scale population monitoring data.

210.    The non-detriment findings for leopard trophies from Tanzania make clear that Tanzania assumes that all hunting areas are occupied by leopards. However, this assumption is based on camera trap data in eight hunting areas where leopards in three sites were common, leopards in one site were fairly common, and leopards in four sites were rare (meaning only one animal was seen).

211.    The non-detriment findings for leopard trophies from Tanzania contain inadequate population data for considering the leopard population.

212.    The non-detriment findings for leopard trophies from Tanzania do not consider alternative metrics for assessing the status of the leopard population such as prey availability and habitat assessments.

213.    The non-detriment findings for leopard trophies from Tanzania do not consider the leopard population or other conditions in the specific area of the country where the leopard is to be killed for import.

214.    The primary threats to leopards in Tanzania are direct persecution due to human-wildlife conflict, capture in snares set for bushmeat, habitat loss, prey depletion, and illegal harvest.

215.    The non-detriment findings for leopard trophies from Tanzania do not consider the loss of leopards due natural mortality.

216.    The non-detriment findings for leopard trophies from Tanzania do not consider legal and illegal trade and all uses of leopards both domestically and internationally.

217.    The non-detriment findings for leopard trophies from Tanzania do not rely on the best available biological information. This information includes, for example:

a.  Data, information, or studies on the loss and fragmentation of habitat in Tanzania;

b.  Studies, data, information, or annual reports on leopards killed by direct persecution due to human-wildlife conflict and any estimates of the percentage of deaths reported and the actual number of deaths those reported incidents represent;

c.  Data, information, or studies on the illegal leopard skin trade in southern Africa and Tanzania's role in that trade;

d.  Data, information, or studies on domestic uses of leopards in Tanzania;

    e.  Data, information, or studies on trophy hunting and non-tourist hunting of leopards in Tanzania;

    f.  Recent population estimates for leopards in Tanzania;

    g.  Data, information, or studies on leopard prey declines and the bushmeat trade; and

    h.  Data, information, or studies on natural mortality rates of leopards.

218.    The Service had insufficient information on the status of leopards in Tanzania upon which to consider whether trophy hunting would contribute to the over-utilization of leopards.

219.    The Service had insufficient information on leopards in Tanzania upon which to consider whether trophy hunting would pose a net harm to the status of the species in the wild.

220.    The Service had insufficient information on leopards in Tanzania upon which to consider whether leopard trophy hunting would cause long-term declines that would place the viability of the affected leopard population in question.

221.    The Service had insufficient information on leopards in Tanzania upon which to consider whether leopard trophy hunting would cause an increased risk of extinction to leopards as a whole or in the population from which the specimen was obtained.

222.    The Service had insufficient information on leopards in Tanzania upon which to consider whether trophy hunting would interfere with the recovery of the species.

223.     The Service had insufficient information on leopards in Tanzania upon which to determine that trophy hunting is not detrimental to the survival of leopards.

**H. Leopard Trophy Hunting in Zambia and U.S. Non-Detriment Findings**

224.     Zambia is a land-locked leopard range state located in southern Africa.

225.     Leopards are thought to occur in two main populations in Kafue and Luangwa and five smaller populations in the northwest, west, southwest, and north.

226.     In 2013 through 2015, Zambia suspended trophy hunting of leopards due to concerns about the status of the leopard population.

227.     Trophy hunting resumed in 2016.

228.     Hunting of all wildlife without a permit is illegal, and leopards are designated as a protected species meaning penalties for poaching them are higher than for other wildlife.

229.     Hunting quotas are set annually using a participatory process with government officials, hunting lease holders, community resource boards, and others. The quotas are based on hunting records and field observations.

230.     In 2016, Zambia established leopard hunting guidelines that contain a number of measures but the non-detriment findings for leopard trophies from Zambia indicate these guidelines were slated to be reviewed in 2018.

231.     The size of the leopard population in Zambia is unknown.

232.     The Service has found that imports of leopard trophies from Zambia are not detrimental.

233.   The non-detriment findings for leopard trophies from Zambia do not contain a reliable population estimate based on population monitoring data.

234.   The non-detriment findings for leopard trophies from Zambia do not consider other metrics to attempt to quantify the leopard population such as prey availability and habitat assessments.

235.   The non-detriment findings for leopard trophies from Zambia do consider the status of the leopard population or other conditions in the specific area of the country where the leopard is to be killed for import.

236.   The specific threats to leopards in Zambia include habitat loss and fragmentation, bushmeat poaching and snaring, direct persecution due to human-wildlife conflict, prey loss, and illegal harvest.

237.   The non-detriment findings for leopard trophies from Zambia do not consider the legal and illegal trade and all uses of leopards both domestically and internationally.

238.   The only attempt in the non-detriment findings for leopard trophies from Zambia to consider the impact of these threats to leopards is the acknowledgement that Zambia confiscated 110 illegal leopard skins over a five-year period.

239.   The non-detriment findings for leopard trophies from Zambia fail to consider use of leopards including "non-tourist" hunting of leopards and demand for leopard skins for religious purposes.

240.   The non-detriment findings for leopard trophies from Zambia do not rely on the best available biological information. This information includes, for example:

50

a.  Data, information, or studies on the loss and fragmentation of habitat in Zambia;

b.  Studies, data, information, or annual reports on leopards killed by direct persecution due to human-wildlife conflict and any estimates of the percentage of deaths reported and the actual number of deaths those reported incidents represent;

c.  Data, information, or studies on the illegal leopard skin trade in southern Africa and Zambia's role in that trade;

d.  Data, information, or studies on ceremonial and other domestic uses of leopards in Zambia;

e.  Data, information, or studies on trophy hunting and non-tourist hunting of leopards in Zambia;

f.  Data, information, or studies on leopard prey declines and the bushmeat trade;

g.  Recent population estimates for leopards in Zambia; and

h.  Studies on natural mortality rates of leopards.

241.   The Service had insufficient information on the status of leopards in Zambia upon which to consider whether trophy hunting would contribute to the over-utilization of leopards.

242.   The Service had insufficient information on leopards in Zambia upon which to consider whether trophy hunting would pose a net harm to the status of the species in the wild.

243.    The Service had insufficient information on leopards in Zambia upon which to consider whether leopard trophy hunting would cause long-term declines that would place the viability of the affected leopard population in question.

244.    The Service had insufficient information on leopards in Zambia upon which to consider whether leopard trophy hunting would cause an increased risk of extinction to leopards as a whole or in the population from which the specimen was obtained.

245.    The Service had insufficient information on leopards in Zambia upon which to consider whether trophy hunting would interfere with the recovery of the species.

246.    The Service had insufficient information on leopards in Zambia upon which to determine that trophy hunting is not detrimental to the survival of leopards.

247.    On information and belief, the Service will continue to make non-detriment findings for leopard trophy imports from Mozambique, Zimbabwe, Tanzania, and Zambia without considering relevant factors for non-detriment findings and the best available biological information on the status and size of leopard populations or other meaningful metrics to estimate leopard status, all uses of leopards both legal and illegal, leopard management and conservation, and natural mortality rates.

**I.   The Service's Leopard Trophy Import Decisions**

248.    The following decisions by the Service authorizing leopard trophy imports are for future hunts with dates during which most of the world has been in quarantine and travel has been limited, restricted, or even foreclosed in an effort to halt the spread of the virus causing COVID-19.

249.    On information and belief, these hunts have not yet taken place.

52

250. Each non-detriment finding issued for leopard trophy imports from a specific country from 2019 and 2020 contains substantially the same information as the other non-detriment findings for the same country during that time period.

251. The findings differ only insofar as they each contain a unique brief paragraph identifying the Applicant, the intended reserve where he or she plans to hunt a leopard or leopards, and the intended dates of the hunt.

252. Over time, the Service has expanded the discussion regarding the CITES CoP-set leopard quotas that is included near the end of each finding. But this discussion and the agency's general findings on leopards are consistent for all four countries.

253. Given this pattern and the presumption of regularity of government operations, on information and belief, the Service has and will continue to authorize leopard trophy imports in this same manner.

254. The following decisions by the Service authorizing leopard trophy imports mark the consummation of the agency's decisionmaking process and are actions from which rights or obligations have been determined, or from which legal consequences flow.

255. On information and belief, Plaintiffs have only received copies of, and the following decisions represent, a small percentage of the leopard applications that are typically submitted in a year and acted upon by the Service from Mozambique, Tanzania, Zambia, and Zimbabwe.

256. The organizational Plaintiffs request leopard trophy import records (applications, findings, and permits) under the Freedom of Information Act, and it takes

the Service many months to respond. As the Service is several months behind in responding to Plaintiffs' requests, Plaintiffs did not become aware of the below approvals until months after they were issued, delaying Plaintiffs' ability to file the present case.

### 1. Mozambique Approvals

257.    The Service issued a non-detriment finding in March 2019 and a CITES import permit (20US24565D/9) on May 7, 2020 for an Applicant from Alabama to import one leopard from a hunt taking place near Maravia, Mozambique.

### 2. Tanzania Approvals

258.    The Service issued a non-detriment finding in April 2019 and a CITES import permit (20US29996D/9) on April 23, 2020 for an Applicant from Louisiana to import one leopard from a hunt taking place on the Selous Game Reserve, Tanzania.

259.    The Service issued a non-detriment finding and a CITES import permit (20US75521D/9) on May 21, 2020 and for an Applicant from Washington to import one leopard from a hunt taking place on or near the Moyowosi Game Reserve-Arusha, Tanzania.

260.    The Service issued a non-detriment finding for an Applicant from Wisconsin to import one leopard from a hunt taking place on or near Moyowosi Game Reserve, Arusha, Tanzania. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service also issued a CITES import permit to this Applicant.

261.    The Service issued a non-detriment finding in May 2020 and a CITES import permit (20US75496D/9) on May 22, 2020 for an Applicant from California to

1   import one leopard from a hunt taking place on or near Lukwati North, Chunya Msami,

2   or Chunya Lukwati, Tanzania.

3         262.   On information and belief, the Service issued a non-detriment finding for

4   an Applicant from Colorado to import one leopard from a hunt to take place Maswa

5   Game Reserve North near the southwest border of the Serengeti National Park in

6   Tanzania. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and

7   § 23.74, on information and belief the Service also issued a CITES import permit to this

8   Applicant.

9         263.   On information and belief, the Service issued a non-detriment finding for

10   an Applicant from Texas to import one leopard from a hunt to take place in the

11   Moyowosi Game Reserve in Arusha, Tanzania. Barring any disqualifying factor,

12   including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service

13   also issued a CITES import permit to this Applicant.

14        **3.  Zambia Approvals**

15         264.   The Service issued a non-detriment finding for an Applicant from Michigan

16   to import one leopard from a hunt taking place on or near the Chifunda Hunting Block,

17   Zambia. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and

18   § 23.74, on information and belief the Service also issued a CITES import permit to this

19   Applicant.

20        **4.  Zimbabwe Approvals**

21         265.   The Service issued a non-detriment finding in April 2020 and a CITES

22   import permit (20US71811D/9) on April 20, 2020 for an Applicant from Wisconsin to

import one leopard from a hunt taking place at or near the Save Valle Conservancy in Masvingo Province, Zimbabwe.

266. The Service issued a non-detriment finding in March 2020 for an Applicant from California to import one leopard from a hunt taking place on or near Bubye Valley Conservancy, Zimbabwe. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service also issued a CITES import permit to this Applicant.

267. The Service issued a non-detriment finding in March 2020 for an Applicant from Florida to import one leopard from a hunt taking place on or near Humani Ranch, Save Valley Conservancy near Chiredzi, Zimbabwe. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service also issued a CITES import permit to this Applicant.

268. The Service issued a non-detriment finding in March 2020 for an Applicant from Mississippi to import one leopard from a hunt taking place on or near Bubye Valley Conservancy, Bulawo, Zimbabwe. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service also issued a CITES import permit to this Applicant.

269. On information and belief, the Service issued a non-detriment finding for an Applicant from Utah to import one leopard from a hunt to take place at the Border Ridge and Sentinal Ranch near Beitbridge, Zimbabwe. Barring any disqualifying factor, including those in 50 C.F.R. § 13.21 and § 23.74, on information and belief the Service also issued a CITES import permit to this Applicant.

270.    On information and belief, the Service will continue to authorize leopard trophy imports in contravention of CITES' non-detriment requirement.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**The Service Acted Arbitrarily, Capriciously, and Contrary to Law Including by Failing to Consider Required Factors (50 C.F.R. § 23.61(c), (e), (g), (f))**

271.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

272.    In authorizing leopard trophy imports through issuing positive non-detriment findings and import permits, including those listed in paragraphs 257 to 269, the Service has failed to consider specifically enumerated factors and in so doing acted arbitrarily, capriciously, and contrary to law. To issue an import permit for leopards, the Service must make a valid non-detriment finding. CITES, art. III, ¶¶ 1, 3(a); 50 C.F.R. §§ 23.35(c)(1), 23.61(a). It makes this finding by "evaluat[ing] the biological impact" of the activity based on the consideration of enumerated factors. 50 C.F.R. § 23.61(f)(3).

273.    To find an import is not detrimental, the Service must consider whether: (1) the exporting country has "a biologically based sustainable-use management plan" that protects the species against over-utilization; or, if no such plan exists, (2) based on other evidence, the "removal" will "not contribute to the over-utilization of the species considering both domestic and international uses." 50 C.F.R. § 23.61(c)(2), (3); *see also id.* § 23.61(g) (Service must consider "the cumulative risks" of the trade including the "[v]olume of legal trade" and "[v]olume of illegal trade").

274.   In making leopard trophy import decisions, such as those for trophies from Mozambique and Zimbabwe, listed in paragraphs 257 and 265 to 269, which do not have current, biologically based sustainable use management plans, the Service failed to consider "both domestic and international uses" of leopards. The agency's non-detriment findings and permitting decisions are therefore contrary to the Service's CITES regulations and arbitrary and capricious as they fail to consider an important aspect of the problem.

275.   Likewise, in relying upon management plans, such as those for trophies from Tanzania and Zambia, listed in paragraphs 258 to 264, in making leopard trophy import decisions, the Service issued permits and positive non-detriment findings without considering whether such plans are biologically based and designed to eliminate over-utilization of leopards. The plans and the agency's findings fail to consider relevant factors including: all other uses of leopards beyond trophy hunting; adequate population information or a reliable alternative metric; localized and national impacts to leopards; current scientific information and data on leopards including natural mortality rates; and the adequacy, protectiveness, and age of the plans and the process employed to allocate quotas. The agency's leopard trophy import decisions are therefore contrary to the Service's CITES regulations and arbitrary and capricious as they failed to consider an important aspect of the problem.

276.   To find an import is not detrimental, the Service must consider whether leopard trophy hunting "pose[s] no net harm to the status of the species in the wild." 50 C.F.R. § 23.61(c)(4). In making leopard trophy import decisions, including those listed in

1   paragraphs 257 to 269, the Service failed to consider whether leopard trophy hunting would

2   pose no net harm to the status of the species in the wild.

3       277.    To find an import is not detrimental, the Service must consider whether

4   leopard trophy hunting would lead "to long-term declines that would place the viability of

5   the affected population in question." 50 C.F.R. § 23.61(c)(5). In making leopard trophy

6   import decisions, including those listed in paragraphs 257 to 269, the Service failed to

7   consider whether leopard trophy hunting would lead to long-term declines that would place

8   the viability of the affected leopard population in question.

9       278.    To find an import is not detrimental, the Service must consider whether

10  leopard trophy hunting will cause "an increased risk of extinction for either the species as

11  a whole or the population from which the species was obtained." 50 C.F.R. § 23.61(e)(1).

12  In making leopard trophy import decisions, including those listed in paragraphs 257 to 269,

13  the Service failed to consider whether leopard trophy hunting would risk extinction of

14  leopards as a whole or in the population from which the leopard is to be taken.

15      279.    To find an import is not detrimental, the Service must consider whether

16  leopard trophy hunting will "interfere with the recovery of the species." 50 C.F.R.

17  § 23.61(e)(2). In making leopard trophy import decisions, including those listed in

18  paragraphs 257 to 269, the Service failed to consider whether leopard trophy hunting would

19  interfere with the recovery of leopards.

20      280.    In making leopard trophy import decisions through issuing positive non-

21  detriment findings and import permits, including those listed in paragraph 257 to 269, the

22  Service has acted arbitrarily and capriciously and not in accordance with law, in violation

59

of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

**SECOND CLAIM**

**The Service Acted Arbitrarily, Capriciously, and Contrary to Law by Failing to Use the Best Available Biological Information in Authorizing Leopard Trophy Imports (50 C.F.R. § 23.61(f), (h))**

281.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

282.   In authorizing leopard trophy imports through issuing positive non-detriment findings and import permits, including those listed in paragraph 257 to 269, the Service has failed to use "the best available biological information," including in "evaluat[ing] the biological impacts of the proposed activity." 50 C.F.R. § 23.61(f), (f)(3); *id.* § 23.61(h) (Service "will consider . . . the best available biological information" in making non-detriment findings for Appendix-I species with export quotas set by the CITES Parties during a Conference of the Parties).

283.   In issuing non-detriment findings for leopard trophy imports, including those listed in paragraph 257 to 269, the Service has failed to consider the best available biological information including, but not limited to, the information described in paragraphs 163, 192, 217, and 240.

284.    The Service also improperly issues non-detriment findings for leopard trophy imports, including those listed in paragraph 257 to 269, without adequate leopard population data.

285.    The agency's leopard trophy import decisions are therefore arbitrary and capricious and contrary to law as they were not based on the best available biological information on the status, management, and use of leopards.

286.    In making leopard trophy import decisions through issuing positive non-detriment findings and import permits, including those listed in paragraphs 257 to 269, the Service has acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

**THIRD CLAIM**

**The Service Acted Arbitrarily, Capriciously, and Contrary to Law by Failing to Take Precautionary Measures and Not Make Findings Where Insufficient Information was Provided and Factors Were Not Met (50 C.F.R. § 23.61(f)(4))**

287.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

288.    In authorizing leopard trophy imports through issuing positive non-detriment findings and import permits, including those listed in paragraphs 257 to 269, the Service had insufficient information on leopards to determine whether overutilization, sustainable use, and net harm is occurring, among other factors. *See* 50 C.F.R. § 23.61(c)(1)-(5), (e)(1)-

(2), (f)(3), (h). As a result, the CITES regulations call for the agency to "take precautionary measures" and not "make the required finding of non-detriment." *Id..* § 23.61(f)(4).

289.   In making leopard trophy import decisions through issuing positive non-detriment findings and import permits, including those listed in paragraphs 257 to 269, the Service has acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiffs and Plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, when the agency has not considered whether over-utilization of leopards is occurring;

B.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, when the agency has not considered whether trophy hunting poses no net harm to the status of the species in the wild;

C.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, when the agency has not considered whether trophy hunting poses long term declines that would place the viability of the affected leopard population in question;

D.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, when the agency has not considered whether trophy hunting poses an increased risk of extinction to the species or to the population from which the leopard was taken;

E.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, when the agency has not considered whether trophy hunting would not interfere with the recovery of the species;

F.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, without the best available biological information;

G.   Declare that it is unlawful for Defendants to make positive leopard trophy import decisions, including those listed at paragraphs 257 to 269, based on insufficient information and when the relevant non-detriment finding factors have not been met;

H.   Declare that the Service cannot lawfully make positive leopard trophy import decisions for leopard trophies from Mozambique, Tanzania, Zambia, and Zimbabwe, until the agency can adequately consider: all uses of leopards, where leopards are being over-utilized, and whether no net harm is result and recovery will not be impeded, based upon the best available biological information;

I.   Declare Defendants' leopard trophy import decisions listed at paragraphs 257 to 269 are arbitrary, capricious, and not in accordance with the law;

1   J.  Set aside and remand all leopard trophy import decisions listed in paragraphs

2     257 to 269;

3   K.  Award Plaintiffs their fees and costs; and

4   L.  Grant Plaintiffs such other relief as the Court deems just and proper.

5

6  DATED: October 28, 2020    Respectfully submitted,

7              /s/ *Tanya Sanerib*
              Tanya Sanerib (DDC Bar No. 473506)

8            Phone: (206) 379-7363
              Email: tsanerib@biologicaldiversity.org

9            Sarah Uhlemann (WA Bar No. 41164)
              Phone: (206) 327-2344

10           Email: suhlemann@biologicaldiversity.org
              Center for Biological Diversity

11           2400 NW 80th Street, #146
              Seattle, WA 98117

12           *Pro Hac Vice Applicants*

13           Laura Friend Smythe (DDC Bar No. NY0217)
              Phone: (202) 676-2331

14           lsmythe@humanesociety.org
              The Humane Society of the United States

15           1255 23rd Street NW, Suite 450
              Washington, DC 20037

16           *Pro Hac Vice Applicant*

17           *Attorneys for Plaintiffs*

18

19

20

21

22