Tanya Sanerib (DDC Bar No. 473506)
Phone: (206) 379-7363
Email: tsanerib@biologicaldiversity.org
Sarah Uhlemann (WA Bar No. 41164)
Phone: (206) 327-2344
Email: suhlemann@biologicaldiversity.org
Center for Biological Diversity
1037 NE 65th Street, #128
Seattle, WA 98115
*Admitted Pro Hac Vice*

Margaret Robinson (DDC Bar No. 241415)
Phone: (434) 260-4871
Email: mrobinson@humanesociety.org
Nicholas Arrivo (CA Bar No. 296173)
Phone: (202) 961-9446
Email: narrivo@humanesociety.org
The Humane Society of the United States
1255 23rd Street, NW, Suite 450
Washington, DC 20037
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity, et al., | |
| *Plaintiffs*, | Case No. 4:20-cv-00461-JGZ |
| v. | |
| Debra Haaland, et al., | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENOR'S CROSS MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| *Defendants*, | |
| Safari Club International, | |
| *Defendant-Intervenor*. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES........................................................................... iii

INTRODUCTION........................................................................................... 1

ARGUMENT .................................................................................................. 1

I.   The Court Has Jurisdiction and May Reach the Merits of the Case ....................... 1

   A.   Plaintiffs Have Standing to Pursue this Case ....................................... 3

      1.   Plaintiffs Are Injured by the Service's Import Authorizations...................... 3

         a.   Plaintiffs' injuries were imminent at the time of filing................................ 3

         b.   Plaintiffs' routine Africa visits have a geographic nexus with
              the effects of leopard trophy hunting ................................. 4

      2.   The Service's Conduct Causes Plaintiffs' Injuries, Which
           Are Redressable ................................................................... 10

   B.   Jurisdiction Existed at the Outset of This Case, and the Claims
        Are Ripe and Not Programmatic .......................................... 14

      1.   Plaintiffs' Claims are Ripe, and They Challenge Final Agency Actions ..... 15

      2.   Plaintiffs Seek Review of Final Agency Actions, Not A Program............... 16

II.   The Service Failed to Base Its Import Authorizations on the Best Available
      Science and Lacked Sufficient Information to Find Non-Detriment.................... 18

   A.   The Service Failed to Base Its Leopard Trophy Import Authorizations
        on the Best Available Science .................................................. 19

      1.   The NDFs are Not Based on Science Concluding Trophy Trade
           Should be Limited to Leopards Older than Seven....................... 19

      2.   Tanzania NDFs are Not Based on Science Showing that Females
           are Likely Hunted ......................................................... 23

      3.   Zimbabwe NDFs are Not Based on Science Regarding the
           Dangers of Using Dogs to Hunt Leopards .................................. 25

      4.   The NDFs are Not Based on Science Regarding Other Threats................. 25

   B.   The Service Had Insufficient Information to Consider Whether
        the Required NDF Factors Are Met.................................................. 26

1.  Population Status Information Is Insufficient ................................................ 28

2.  Mortality and Management Information Are Insufficient ............................ 29

3.  Increased Extinction Risk and Leopard Recovery Were
    Not Considered ........................................................................................... 31

4.  The Service Must Make Independent Findings and Not Defer
    to the CITES Quotas ................................................................................... 32

C.  Insufficient Information and Inadequate Consideration of NDF
    Factors Requires the Service to Take Precautionary Measures ........................ 33

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Tunaboat Ass'n v. Baldrige*,
    738 F.2d 1013 (9th Cir. 1984) ......................................................................... 27

*Amoco Oil Co. v. EPA*,
    501 F.2d 722 (D.C. Cir. 1974) ........................................................................ 19

*Bishop Paiute Tribe v. Inyo Cnty.*,
    863 F.3d 1144 (9th Cir. 2017) ....................................................................... 4, 5

*Brower v. Evans*,
    257 F.3d 1058 (9th Cir. 2001) .................................................................... 27, 30

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ....................................................................................... 16, 17

*California v. Texas*,
    141 S. Ct. 2104 (2021) .................................................................................... 12

*Cary v. Hall*,
    No. 05-4363, 2006 U.S. Dist. LEXIS 78573 (N.D. Cal. Sep. 30, 2006) ........................ 10

*City & Cnty. of S.F. v. Garland*,
    42 F.4th 1078 (9th Cir. 2022) ....................................................................... 2, 16

*Colwell v. HHS*,
    558 F.3d 1112 (9th Cir. 2009) ......................................................................... 15

*Cottonwood Envtl. Law Ctr. v. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ......................................................................... 16

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ............................................................................. 7

*Ctr. for Biological Diversity v. Salazar*,
    804 F. Supp. 2d 987 (D. Ariz. 2011) ........................................................... 21, 25

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ........................................................ 19, 21, 22, 24

*Davidson v. O'Reilly Auto Enterprises, LLC,*
  968 F.3d 955 (9th Cir. 2020) ........................................................................ 35

*Davis v. FEC,*
  554 U.S. 724 (2008) ........................................................................................ 4

*Defenders of Wildlife v. Endangered Species Scientific Auth.,*
  725 F.2d 726 (D.C. Cir. 1984) ...................................................................... 29

*DOC v. New York,*
  139 S. Ct. 2551 (2019) ...................................................................... 12, 13, 16

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.,*
  874 F.3d 1083 (9th Cir. 2017) ........................................................................ 9

*Ecological Rts. Found. v. Pac. Lumber Co.,*
  230 F.3d 1141 (9th Cir. 2000) ................................................................. 3, 7, 9

*Eichwedel v. Curry,*
  700 F.3d 275 (7th Cir. 2012) ........................................................................ 11

*Env't Prot. Info. Ctr. v. Pac. Lumber Co.,*
  469 F. Supp. 2d 803 (N.D. Cal. 2007) ............................................................ 7

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
  36 F.4th 850 (9th Cir. 2022) ......................................................................... 16

*Fikre v. FBI,*
  904 F.3d 1033 (9th Cir. 2018) ...................................................................... 14

*Franks v. Salazar,*
  816 F. Supp. 2d 49 (D.D.C. 2011) ..................................................... 26, 31, 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................................ 2

*Gallo Cattle Co. v. USDA,*
  159 F.3d 1194 (9th Cir. 1998) ...................................................................... 15

*Gonzalez v. ICE,*
  975 F.3d 788 (9th Cir. 2020) .......................................................................... 4

iv

*Greater Yellowstone Coal., Inc. v. Servheen*,
  672 F. Supp. 2d 1105 (D. Mont. 2009) ........................................................... 21

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) ......................................................................... 30

*Guadiana v. State Farm Fire & Cas. Co.*,
  No. 07-326, 2009 U.S. Dist. LEXIS 104856 (D. Ariz. Nov. 9, 2009) ............................. 2

*High Sierra Hikers Ass'n v. Blackwell*,
  390 F.3d 630 (9th Cir. 2004) ................................................................ 16, 17

*Hsiao v. Stewart*,
  527 F. Supp. 3d 1237 (D. Haw. 2021) .............................................................. 15

*Idaho Watersheds Project v. Hahn*,
  307 F.3d 815 (9th Cir. 2002) ..................................................................... 15

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ...................................................................... 2

*Kern Cnty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) ........................................................... 20, 21, 24

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
  567 U.S. 298 (2012) ................................................................................ 11

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009) ..................................................................... 14

*Log Cabin Republicans v. U.S.*,
  716 F. Supp. 2d 884 (C.D. Cal. 2010) .............................................................. 5

*Lujan v Defenders of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 4, 7, 10

*Marcum v. Salazar*,
  810 F. Supp. 2d 56 (D.D.C. 2011) ............................................................ passim

*Martinez v. Barr*,
  941 F.3d 907 (9th Cir. 2019) ..................................................................... 16

*Mendia v. Garcia*,
  768 F.3d 1009 (9th Cir. 2014)................................................................. 10, 12

*Navajo Nation v. DOI*,
  876 F.3d 1144 (9th Cir. 2017)........................................................................ 15

*NRDC v. EPA*,
  38 F.4th 34 (9th Cir. 2022) ............................................................................. 3

*NRDC v. Bernhardt*,
  No. 05-01207, 2019 U.S. Dist. LEXIS 30649 (E.D. Cal. Feb. 26, 2019)....................... 27

*NRDC v. EPA*,
  542 F.3d 1235 (9th Cir. 2008).......................................................................... 9

*Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*,
  117 F.3d 1520 (9th Cir. 1997).......................................................................... 8

*Oregon Natural Desert Ass'n v. BLM*,
  531 F.3d 1114 (9th Cir. 2008)..................................................................... 20, 34

*Pit River Home and Agric. Co-op. Ass'n v. v. U.S.*,
  30 F.3d 1088 (9th Cir. 1994)........................................................................... 2

*Pizzuto v. Tewalt*,
  997 F.3d 893 (9th Cir. 2021).......................................................................... 16

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  735 F. App'x 241 (9th Cir. 2018) ...................................................................... 5

*Prima v. DOI*,
  No. 96-3578, 1998 U.S. Dist. LEXIS 2203 (E.D. La. Feb. 19, 1998)............................ 29

*Ree v. Zappos.com, Inc.*,
  888 F.3d 1020 (9th Cir. 2018).......................................................................... 16

*Reed Elsevier, Inc. v. Muchnick*,
  559 U.S. 154 (2010) .................................................................................... 15

*Renee v. Duncan*,
  686 F.3d 1002 (9th Cir. 2012)..................................................................... 10, 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014)......................................................................... 20

*SCI v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016) ....................................................................... 3

*SCI v. Jewell*,
    No. 14-0670, 2015 U.S. Dist. LEXIS 177573 (D.D.C. Mar. 12, 2015) ........................... 7

*SCI v. Jewell*,
    76 F. Supp. 3d 198 (D.D.C. 2014) .................................................................. 13

*SCI v. Zinke*,
    No. 14-0670, 2017 U.S. Dist. LEXIS 231295 (D.D.C. May 2, 2017) ............................ 7

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
    968 F.3d 738 (9th Cir. 2020)..................................................................... 12, 13

*Sw. Ctr. for Biological Diversity v. Forest Serv.*,
    82 F. Supp. 2d 1070 (D. Ariz. 2000) .............................................................. 5, 8

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017)..................................................................passim

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013)........................................................................ 3

*W. Radio Servs. Co. v. Qwest Corp.*,
    530 F.3d 1186 (9th Cir. 2008) ...................................................................... 16

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) ..................................................................... 13, 17

*WildEarth Guardians v. Provencio*,
    923 F.3d 655 (9th Cir. 2019)..................................................................... 10, 11

*Winter v. NRDC*,
    555 U.S. 7 (2008) .................................................................................... 15

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010)................................................................. 2, 14, 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

5 U.S.C. § 704 ................................................................................................ 15

5 U.S.C. § 706 ................................................................................................ 15

16 U.S.C. § 1537a(c) ............................................................................... 29, 34

28 U.S.C. § 1331 ............................................................................................ 15

**Treaty**

Convention on International Trade in Endangered Species of Fauna and Flora,
    art. II, Mar. 3, 1973, 27 U.S.T. 1087 ..................................................... 32

Convention on International Trade in Endangered Species of Fauna and Flora,
    art. IV, Mar. 3, 1973, 27 U.S.T. 1087 .................................................... 29

**Regulations**

50 C.F.R. § 13.28(a) ...................................................................................... 14

50 C.F.R. § 23.5 ............................................................................................ 21

50 C.F.R. § 23.61 ................................................................................... passim

50 C.F.R. § 23.61(b) ................................................................................. 27, 30

50 C.F.R. § 23.61(c) ............................................................. 19, 27, 29, 30, 31

50 C.F.R. § 23.61(e) ............................................................................. 26, 28, 32

50 C.F.R. § 23.61(f) ............................................................................... passim

50 C.F.R. § 23.61(g) ................................................................................. 26, 29

50 C.F.R. § 23.61(h) ................................................................................. 32, 33

**Federal Register Notices**

71 Fed. Reg. 20,168 (April 19, 2006) ........................................... 27, 30, 34, 35

72 Fed. Reg. 48,402 (Aug. 23, 2007) ......................................................... 22, 33

**INTRODUCTION**

Leopard abundance is a myth created by decades-old, faulty information. The reality is that leopards are believed to be declining, including from poorly managed trophy hunting. Nonetheless, the Service continues to authorize trophy trade from Tanzania, Zambia, and Zimbabwe—even though the agency admits that it lacks population and full mortality data for leopards in these countries. This glaring hole is significant. In the *only* nation that has assessed its leopard population, South Africa, trophy hunting was halted due to alarming population declines. Yet trophy imports from Tanzania, Zambia, and Zimbabwe are continually authorized even though these countries' hunting management practices cannot be reconciled with the best available science on reducing risks and sufficient information on population status is lacking. The Service's non-detriment findings ("NDFs") and permits are thus arbitrary, capricious, and contrary to the Service's regulations, which mandate a precautionary approach when information is insufficient.

It is thus no surprise the Service and Safari Club International ("SCI") (collectively "Defendants") spill considerable ink on arguments designed to avoid reaching the merits of this case. Using an "everything but the kitchen sink" approach, they raise standing, mootness, ripeness, final agency action, and programmatic challenges, including re-raising several issues already addressed by the Court in denying Defendants' motions to dismiss. Ultimately, Defendants' effort to avoid the merits fails because Plaintiffs had standing when they filed the relevant complaints. And, as this Court concluded, the challenged conduct is capable of repetition, yet evading review, so the Court has jurisdiction to reach the merits.

**ARGUMENT**

**I.     The Court Has Jurisdiction and May Reach the Merits of the Case**

Jurisdiction exists despite Defendants' scattershot challenge to the justiciability of this matter. Conflating standing with mootness and ripeness, Defendants seek to stop the Court from ever evaluating the Service's unlawful decision-making. Many of Defendants' arguments are irrelevant because the Service's actions are capable of repetition, yet evading review. ECF No. 41, at 12-13 ("2d MTD Order"). That mootness exception "permits actions

1

'for prospective relief to go forward despite abatement of the underlying injury.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1053-54 (9th Cir. 2010) (internal citation omitted). Pigeonholing mootness issues into standing points, the Service repeats arguments this Court has previously rejected. *Compare* Defs. Br. at 9-12 (raising 14 expired or surrendered permits) *with* 2d MTD Order at 12-13.[1] Defendants also ignore that standing is assessed at the time of filing and Plaintiffs' then-imminent injuries, caused by the Service's actions, were (and remain) redressable based on the filing of the original complaint. When the "flexible" mootness doctrine is applied here, *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012), it defeats many of Defendants' arguments, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 173 (2000) (harm "may be too speculative to support standing, but not too speculative to overcome mootness").

Defendants also raise prudential arguments, which are equally unavailing. For ripeness, *unlike* standing, "we evaluate 'the situation now,'" *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022), and the Service's actions are all final. Further, Plaintiffs' claims challenge numerous discrete final agency actions that all suffer from the same legal deficiencies identified in Plaintiffs' claims, so there is no programmatic challenge. Ultimately, while this case stands in a unique procedural posture, Plaintiffs have satisfied their burden to establish this Court's jurisdiction.[2]

---

[1] Plaintiffs urge exercise of the Court's discretion to apply the law of the case doctrine to arguments previously rejected. *Pit River Home and Agric. Co-op. Ass'n v. v. U.S.*, 30 F.3d 1088, 1097 (9th Cir. 1994); *see also* Order, ECF No. 24 ("1st MTD Order"); 2d MTD Order. SCI's "act of state" argument was resolved. 2d MTD Order at 6-7. The Service's standing arguments, Defs. Br. at 9-10, 11 (discussing expired and surrendered permits), repeat previous mootness arguments, *see Guadiana v. State Farm Fire & Cas. Co.*, No. Civ 07-326, 2009 U.S. Dist. LEXIS 104856, at *15-16 (D. Ariz. Nov. 9, 2009).

[2] Plaintiffs previously explained, or intended to explain, they were not pursuing challenges to import decisions when Plaintiffs learned the leopards at issue were killed before Plaintiffs filed the operative complaint (not before permitting). MTD Opp'n, ECF No. 13, at 4 n.4; Notice, ECF No. 35. These import decisions are reflected at AR80 and AR81. Plaintiffs acknowledge evidence that two additional leopards were killed before they filed the operative compliant and no longer challenge the associated import decisions, AR109 and

**A. Plaintiffs Have Standing to Pursue this Case**

**1. Plaintiffs Are Injured by the Service's Import Authorizations**

Plaintiffs have established injury by demonstrating (1) "an aesthetic or recreational interest in a particular place[ ] or animal . . . species" and (2) "that that interest is impaired by a defendant's conduct." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) ("*ERF I*"); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1014 (9th Cir. 2013) (court need only determine one party has standing). Plaintiffs suffered injury when this case was filed, and this Court continues to have jurisdiction under a mootness exception.

**a. Plaintiffs' injuries were imminent at the time of filing**

Standing is analyzed at the time a plaintiff commenced suit. *NRDC v. EPA*, 38 F.4th 34, 56 (9th Cir. 2022) ("'When evaluating whether [the standing] elements are present, we must look at the facts as they exist[ed] at the time the complaint was filed'" (internal citations omitted)). Plaintiffs' original complaint was filed on October 28, 2020, Compl., ECF. No. 1, but SCI incorrectly hinges its analysis on the amended complaint's filing date, SCI Br. at 6 (citing no legal authority). Plaintiffs suffered imminent injuries from the agency actions challenged in their three claims when this case was filed and the relevant supplemental complaints (which added new facts, unlike the amended complaint) were noticed.

SCI questions imminency—relying on anticipated hunt dates indicated in permit applications—for hunts *scheduled* for the summer and fall of 2020, arguing the hunts, if they occurred, happened before Plaintiffs filed their complaint in October 2020. SCI Br. at 6-7; Clare Decl., ECF No. 68-1 (category "A"). But these hunts were scheduled during the height of the Covid-19 pandemic, when travel was limited and the world in disarray. Plaintiffs alleged many of these trips would be delayed or rescheduled for this reason, Am. Compl.,

---

AR130. And where neither an NDF nor a permit were issued because an application was withdrawn or administratively closed, AR104, AR132, AR134, AR135, and AR138, Plaintiffs recognize there is no final agency action for the Court to review. Clare Decl. (category "C"). However, Plaintiffs disagree with SCI that an NDF is not a final agency action, and precedent SCI created finds otherwise. *SCI v. Jewell*, 842 F.3d 1280, 1289-90 (D.C. Cir. 2016) (holding NDFs are final agency actions).

ECF No. 10, ¶ 21, which is supported by the record, AR106:3164-65. In fact, Zimbabwe's airports were closed to international travelers until October 2020, Robinson Decl. ¶ 10, and Tanzania extended the country's hunting season—from January to July 2021—because hunters were not traveling there in July 2020 but were anticipated to return later, AR143:4010. Despite delays due to the intervening pandemic, at summary judgment, neither SCI nor the Service offer evidence to document exactly *when* leopards were killed for trophies.[3] Without such timing evidence (information well within Defendants' purview), Defendants have failed to rebut the fact that Plaintiffs' harm was imminent at filing.[4]

Defendants likewise argue that Plaintiffs are not injured by five trophy import permits that later expired without import. Defs. Br. at 9-10; SCI Br. at 8; Clare Decl. (category "E"). At the time of filing, however, those injuries were "imminent," *Lujan v Defenders of Wildlife*, 504 U.S. 555, 564 (1992), thus establishing jurisdiction, *see Davis v. FEC*, 554 U.S. 724, 734 (2008) ("the injury required for standing need not be actualized"); *accord Gonzalez v. ICE*, 975 F.3d 788, 806 (9th Cir. 2020). Because an imminent injury existed at the time of filing, the relevant question is now mootness, and those injuries are capable of repetition yet evading review. *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1155 (9th Cir. 2017) ("'The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)'" (internal citations omitted)).

### b. Plaintiffs' routine Africa visits have a geographic nexus with the effects of leopard trophy hunting

Plaintiffs' repeated past and intended future use of relevant leopard range establish their injuries. Yet SCI insists Plaintiffs satisfy requirements that do not exist under this Circuit's "flexible approach" to injury. *ERF I*, 230 at 1149. A plaintiff establishes injury "by

---

[3] The Service provides evidence of trophy importation but not the dates the leopards died. Two hunts appear to have occurred in October 2020, but there is no evidence the animals were killed before Plaintiffs filed. AR107; AR110.

[4] Specifically, this argument pertains to AR100; AR101; AR103; AR105; AR107; AR110; AR111; AR112. It also applies to SCI's argument about a hunt that was rescheduled because of Covid. AR106:3164-65; Clare Decl. at 5 (applying category "F" to AR106).

showing a connection to the area of concern sufficient to make credible the contention that . . . she really has or will suffer in . . . her degree of aesthetic or recreational satisfaction." *Id.* Here, the question is not whether Plaintiff Mr. Michler and Plaintiffs' members (collectively "Declarants") visit hunting locations, but whether the portions of leopard habitat Declarants use are "perceptibly affected" by that hunting. *Sw. Ctr. for Biological Diversity v. Forest Serv.*, 82 F. Supp. 2d 1070, 1076-77 (D. Ariz. 2000). Declarants regularly travel—and intend to continue to travel—to leopard habitat in each exporting country, and their ability to view and enjoy leopards is negatively affected by the Service's decisions. Declarants' long histories of travel to leopard habitat, as well as their existing plans to travel close to the hunting areas at issue, render Declarants' injuries "concrete," SCI Br. at 9, and Declarants provide sufficient detail about "where [they] will go," *id.*, to establish injury.[5] For example:

- **Tanzania Hunts:** Mr. Michler has concrete plans to return to Serengeti National Park and Ngorongoro Conservation area (both directly abut Maswa Game Reserve). Michler Decl. ¶ 15. Mr. Hartl plans to return the Serengeti in 2024, visiting areas near Maswa Game Reserve. Hartl Supp. Decl. ¶ 4. Ms. Ho intends to visit Katavi National Park (near the Lukwati Game Reserve) soon,[6] Ho Supp. Decl. ¶ 10, and Mr. Michler is scheduled to

[5] Attachment A to the Clauser Declaration contains an updated map based on the declarations Plaintiffs filed with their opening brief (referred to by the declarant's last name ("Ho Decl.")) and the supplemental declarations provided with Plaintiffs' opposition (referred to as: Ho Supp. Decl.; Michler Supp. Decl.; Hartl Supp. Decl.; Osterman Supp. Decl.)). *See also* Exhibit List following this brief. Attachment B to the Robinson Declaration provides a chart of the information in the bulleted text that follows for ease of reference.

[6] In their supplemental declarations, Ms. Ho and Ms. Osterman explain learning of inadvertent lapses of their Humane Society of the United States ("HSUS") memberships after this litigation began. Each immediately renewed her membership upon learning of the lapse. Ho Supp. Decl. ¶ 2; Osterman Supp. Decl. ¶ 2. Ms. Ho has been an employee of Plaintiff Humane Society International, an HSUS member, or both for the entirety of this suit, Ho Supp. Decl. ¶ 2, conferring her necessary personal stake in the matter, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 735 F. App'x 241, 249 (9th Cir. 2018) (organization could assert associational standing on behalf of employees). Further, a brief membership lapse does not disrupt a plaintiff's standing. *See Log Cabin Republicans v. U.S.*, 716 F. Supp. 2d 884, 893-94 (C.D. Cal. 2010) (explaining, among other reasons, "a plaintiff

take clients to the park, Michler Decl. ¶ 15. Mr. Hartl plans to visit areas near Ruaha National Park (also near Lukwati Game Reserve), Hartl Supp. Decl. ¶ 4, and in the scope of his work, Mr. Michler "visit[s] and . . . regularly lead[s] guests in" that park, Michler Decl. ¶ 10. Mr. Michler is scheduled to visit Mahale Mountains National Parks (near Moyowosi Game Reserve).[7] Michler Supp. Decl. ¶ 4. Ms. Ho intends to visit areas surrounding Gombe National Park (near Moyowosi Game Reserve). Ho Supp. Decl. ¶ 10. Next year, Mr. Michler will visit Akagera National Park in Rwanda (near the Tanzania border and Moyowosi Game Reserve), Michler Supp. Decl. ¶ 7, and Mr. Hartl will visit this park during an upcoming sabbatical, Hartl Supp. Decl. ¶ 6.

- **Zambia Hunts:** Ms. Ho plans to visit North Luangwa National Park (near Musalangu Game Management Area, AR152:4118) and Kafue National Park (immediately abutting the Kasonso Busanga Game Management Area) in the next two years. Ho Supp. Decl. ¶ 7. Mr. Michler "visit[s] and . . . regularly lead[s] guests in" Kafue National Park. Michler Decl. ¶ 10. Mr. Hartl's planned 2026 trip to Zambia will include visits in and around North Luangwa National Park and South Luangwa National Park (near Musalangu Game Management Area). Hartl Supp. Decl. ¶ 5. Ms. Osterman plans to return to South Luangwa National Park in 2024. Osterman Decl. ¶¶ 8-10; Osterman Supp. Decl. ¶ 4.

- **Zimbabwe Hunts:** Mr. Hartl intends to visit Mapungubwe National Park and Makuleke Conservancy and other northern parts of Kruger National Park (on the South Africa-Zimbabwe border and near Breitbridge Border Ridge, Bubye Valley Conservancy, and Savé Conservancy) during a sabbatical. Hartl Supp. Decl. ¶ 6. Mr. Michler has traveled to Gonarezhou National Park (near Breitbridge Border Ridge, Bubye Valley Conservancy, and Savé Conservancy), Savé Conservancy, and Mapungubwe National Park and his return is likely given the nature of his work. Michler Supp. Decl. ¶ 4.

---

who possesses standing when it brings suit, later loses it, and then regains standing before entry of judgment, may still maintain its claims"), *vacated*, 658 F.3d 1162 (9th Cir. 2011).
[7] SCI alleges that Moyowosi Game Reserve is a "20-hour car ride" from parks. SCI Br. at 10. Leopards, of course, do not drive cars, so their movement is not constrained by western Tanzania's road infrastructure. *See* 2d Clauser Decl. ¶ 11 (listing distances); *infra* at 8.

Declarants have shown "repeated use as well as credible allegations of future use" of leopard habitat. *Env't Prot. Info. Ctr. v. Pac. Lumber Co.,* 469 F. Supp. 2d 803, 816 (N.D. Cal. 2007) (citing *ERF I*, 230 F.3d at 1149); *see also Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707-08 (9th Cir. 2009) (allegations members "viewed polar bears and walrus in the Beaufort Sea region" was "geographically specific"). Many of Declarants' plans include dates and locations. *See, e.g.*, Michler Decl. ¶ 15; Hartl Supp. Decl. ¶ 4. Some are less specific but no less credible, like Ms. Ho's plan to visit both Kafue and North Luangwa National Parks in the next two years because her work requires her to regularly travel nearby. Ho Supp. Decl. ¶ 7. These latter plans are easily distinguishable from the "some day intentions" found lacking in *Lujan v. Defenders of Wildlife*: a single visit in the distant past and a vague intent to visit again. 504 U.S. at 563-64; *see also* SCI Br. at 11; Defs. Br. at 10-11. "[I]n cases where travel plans are not finalized at the time of the declaration, courts look to the surrounding facts to determine the likelihood or necessity that the declarants finalize their plans." *SCI v. Zinke*, No. 14-0670, 2017 U.S. Dist. LEXIS 231295, at *17 (D.D.C. May 2, 2017).[8] Here, Declarants' history of traveling to and viewing leopards in the exporting countries at issue and the nature of their work as wildlife professionals (for Ms. Ho and Mr. Michler) make their plans sufficient to establish standing. *See id.* ("travelling to the area in question on a regular and repeated basis reduces the need for a concrete travel plan" and "tips the balance of [declarant's] stated travel plans from being merely 'some day' intentions to providing sufficient indicia of concreteness"); *accord. SCI v. Jewell*, No. 14-0670, 2015 U.S. Dist. LEXIS 177573, at *9 (D.D.C. Mar. 12, 2015); *see also ERF I*, 230 F.3d at 1149-50 ("[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent").

Defendants' contentions that Declarants do not travel close enough to the hunt areas to experience injury, SCI Br. at 11-14; Defs. Br. at 10, ignores the wide-reaching, population-

---

[8] *SCI v. Zinke*, 1:14-cv-00670, Minute Order on Reconsideration (May 30, 2017) (permitting ANAF and Center for Biological Diversity to intervene). Robinson Decl. Attach. C.

level harm to leopards caused by the Sevice's import decisions. Trophy hunting: (1) causes population declines, AR 54:1957; AR113:3384; AR137:850; (2) drains leopards from surrounding areas through a "vacuum" effect, AR28:716; AR78:297; AR102:2903-04, 2996; AR 133:3717; and (3) damages the genetic integrity of leopard populations, AR90:2552; AR54:1957; AR102:2997; ER3:10024. These cascading impacts detrimentally impact leopard populations well beyond any individual hunt location. Indeed, young male leopards "can cover distances over 200 km" when setting out to establish their territories, AR90:2543; AR44:1703, so trophy hunting's effects extend to the areas Declarants visit, Clauser Decl. ¶ 11. Hunting thus has population-level impacts that "perceptibly affect[]" Declarants' use and enjoyment of the leopard habitat they visit by limiting their ability to see and enjoy leopards. *Sw. Ctr. for Biological Diversity*, 82 F. Supp. 2d at 1077. This Court previously found that allegations of these effects sufficed to establish injury-in-fact. 2d MTD Order at 9. Plaintiffs now substantiate their allegations with ample record evidence.[9]

SCI—focusing on the "vacuum" effect and ignoring trophy hunting's other harms— demands Plaintiffs either show direct "overlap" of their use of leopard habitat and hunting areas or, in essence, that they conclusively establish leopard population declines in nearby areas. SCI Br. at 11-14.[10] But Plaintiffs do not need to pass some "inflexible, judicially

---

[9] Defendants challenge the admissibility of Dr. Telecky's statements. Defs. Br. at 9 n.6; SCI Br. at 11, 12 n.8, 15 n.10. Plaintiffs cite this declaration for jurisdictional purposes, so extra-record evidence is admissible. *Nw. Envtl. Defense Ctr. v. Bonneville Power Admin*., 117 F.3d 1520, 1527-28 (9th Cir. 1997). As to SCI's arguments regarding Plaintiffs' declarants' statements on the cascading negative impacts of leopard trophy hunting, SCI Br. at 12 n.8, these are borne out by the record, as cited above. Plaintiffs' declarants are competent to testify as to these impacts that affect their recreational use of leopard habitat. But if stricken, then the testimony of SCI's declarants as to the alleged sustainability of trophy hunting, *see, e.g.*, SCI Br. at 14, should also be stricken. Additionally, SCI's reliance on declarations to establish facts must be stricken. SCI. Br. at 3 (citing Leathem Decl. and Van Straten Decl.).

[10] SCI suggests that source-sink effects only impact directly adjacent protected areas. SCI Br. at 12-13. In fact, these impacts are broader because "localized population sinks" caused by trophy hunting "have a disproportionate effect on metapopulation viability." AR28:716. Likewise, SCI implies that where parks Declarants visit abut hunting areas, the parks are so vast in size that adjacent hunting will not harm Declarants' ability to view leopards. SCI Br.

mandated time or distance guidelines" to establish their standing. *ERF I*, 230 F.3d at 1148. Here, trophy hunting's wide-ranging harms are enough to diminish Declarants' ability to see and enjoy leopards nearby. *See id.* at 1149. This Circuit does not require Plaintiffs to demonstrate "actual environmental harm." *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093-94 (9th Cir. 2017) (rejecting defendants' argument their "polluted stormwater . . . could [not] possibly have an environmental impact on a body of water as large as San Francisco Bay" because question of "harm [to] the affected area is a merits question, not a standing question"); *NRDC v. EPA*, 542 F.3d 1235, 1248 (9th Cir. 2008).

Moreover, SCI puts forth no evidence and scant argumentation disputing that trophy hunting causes deleterious effects. *But see* Pls. Br. at 6-7. SCI's contention that Plaintiffs' vacuum theory rests on "excessive offtake," SCI Br. at 14, ignores the *other* detrimental impacts of trophy hunting described above and otherwise documented by Plaintiffs. *See, e.g.*, AR102:3019 ("mortality need not be unsustainable to induce" harmful genetic effects). Grasping at straws, SCI argues fences and human distribution are barriers limiting hunting's harms, SCI Br. at 13-14, but neither is. Leopards can penetrate fences that may be impenetrable to other wildlife. Robinson Decl., Attach. D at 37; AR42:1623-24. At Bubye Valley Conservancy, researchers observed a leopard "freely" crossing an electric fence to access his territory, which spanned both sides of the fence. *Id.* at 29, 37. At Savé Valley Conservancy, fence integrity is questionable with researchers reporting fence removal and "leaky" segments in some areas, allowing for wildlife movement. AR86:2463, 2467; ER12:10152; *see also* SVC Decl., ECF No. 68-4, ¶ 5 (reserve is only "partially surrounded" by a fence). And, given their adaptable behavior and flexibility in prey, AR19:303, leopards can "occur in areas with high human population densities," AR54:1914; *accord* AR44:1714, and do so more often than other species, AR42:1624. Thus, the presence of human-occupied areas does not prevent leopards' migration.

---

at 14 n.9. Again, this point ignores that the vacuum effect extends beyond boundaries, "reverberat[ing] through populations within protected areas." AR 133:3717.

**2.   The Service's Conduct Causes Plaintiffs' Injuries, Which Are Redressable**

Plaintiffs establish both causation and redressability. While standing is not established when injury results from "unfettered choices made by independent actors," it is not precluded merely because harm results directly from a third party's conduct. *Lujan*, 504 U.S. at 562. Thus, when "government action cause[s] injury by influencing the conduct of third parties," a plaintiff need only show "the government's unlawful conduct 'is at least a substantial factor motivating the third parties' actions.'" *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (citations omitted). Further, it is sufficient that "a defendant is at least *partially* causing the alleged injury." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 667-68 (9th Cir. 2019) (emphasis added) (citation omitted). As for redressability, it need not be "a 'guarantee,'" and this "'relatively modest'" burden is met when "an agency has misinterpreted the law" even though the agency might later "reach the same result for a different reason." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (internal citations omitted).

First, Plaintiffs establish causation because, for many hunters, importing a trophy substantially motivates their decision to go on a hunt. *Cary v. Hall*, No. C 05-4363, 2006 U.S. Dist. LEXIS 78573, at *16-17 (N.D. Cal. Sep. 30, 2006) (as "trophies are the end goal of sport hunters, it would be fair to recognize a causal connection between legalizing their importation" and plaintiffs' "injury"). This Court previously accepted Plaintiffs' theory of causation, noting "evidence that U.S. hunters will not hunt if they cannot import their trophies." 2d MTD Order at 12 n.6; *see also* 1st MTD Order at 5. Plaintiffs have shown that when U.S. hunters could not import elephant trophies from Zimbabwe and Tanzania, many said they would not hunt, and hunting outfitters attested to clients canceling hunts. Robinson Decl. ¶¶ 14-17; *see also* Telecky Decl. ECF No. 63-5, at 9-11. Further, the Service has explained that "*most* hunters want to know before their hunt whether they qualify for a permit to import their hunted animal." Robinson Decl. ¶ 18 (emphasis added). Here, *all* the hunters applied for an import permit before their hunt, demonstrating that the ability to import a trophy factored into their decision to hunt. *Id.* ¶ 5. And the record demonstrates these applicants who apply pre-hunt have no reason to be concerned their permits will be denied;

10

1   permits were issued for *every* applicant unless he withdrew his application or failed to

2   provide requested information. *Id.* ¶ 6.

3          To challenge causation and redressability, Defendants point to instances where

4   hunters applied for import permits *before* their trips but were forced to hunt without import

5   authorization due to Service permitting delays. Defs. Br. at 11-12; SCI Br. at 7, 14-15; Clare

6   Decl. (category "B"). These arguments do not undermine Plaintiffs' standing as these

7   deviations were caused by pre-filing, pandemic-spurred government permitting delays and

8   post-filing unilateral delays. Before this suit began, the Service took a median time of 26

9   days to issue an NDF after receiving an application. Robinson Decl. ¶ 19, Attach. I. After

10  Plaintiffs sued, the agency took more than *ten times as long* to issue NDFs—with a median

11  time of 295 days. *Id.*[11] Such "unilateral actions" that occur after litigation commences and

12  that appear "'designed to insulate a decision from review . . . must be viewed with a critical

13  eye.'" *Eichwedel v. Curry*, 700 F.3d 275, 280 (7th Cir. 2012) (quoting *Knox v. Serv. Emps.*

14  *Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)). Further, it was reasonable for hunters to

15  assume the government would act with regularity and timely issue import authorizations,

16  especially where the Service continuously authorizes leopard imports, Robinson Decl. ¶ 6,

17  and thus hunters continued with their trips, SCI Br. at 15. Additionally, Plaintiffs have never

18  argued *all* hunters' decisions to hunt turn on their ability to import a trophy. *See WildEarth*

19  *Guardians*, 923 F.3d at 668 (causation is not defeated if there are multiple sources of injury).

20  However, all hunters *in this case* applied to import their trophies prior to their scheduled

21  hunts, demonstrating that import factored into their decisions. Robinson Decl. ¶ 5. Moreover,

22  the record does not establish that all hunts occurred as scheduled, as SCI admits. SCI Br. at

23  7 n.4. For example, one trip was scheduled for early July 2020, AR105:3120, when

24  Tanzanian officials acknowledged U.S. hunters were not visiting because of Covid closures,

25  AR143:4010, so it is unlikely this hunt occurred *before* the Service issued a permit. Further,

26

27  _____

    [11] The majority of the hunts in this category were added by a supplemental complaint, *see*

28  Clare Decl. (category "B"), and thus after the litigation commenced. For those in the original
    complaint, the pandemic and workplace responses thereto undeniably caused delays.

despite the Service's assertions, Defs. Br. at 11-12, the fact that some hunters hunted before receiving permits does not undermine redressability because a ruling from this Court could meaningfully alter hunter conduct in the future. Infra at 13.

In a similar vein, relying on *California v. Texas*, SCI reinvokes its motion to dismiss argument that Plaintiffs' injuries are not caused by the Service's import authorizations but by "unpredictable" third parties. SCI Br. at 14-16 (citing 141 S. Ct. 2104, 2117 (2021)). But in that case, plaintiffs failed to provide evidence sufficient to support their "counterintuitive theory of standing." *California*, 141 S. Ct. at 2119. Conversely, in *DOC v. New York*, the Supreme Court endorsed a lengthy chain of causation—that the addition of a citizenship question on the census would lead noncitizens to (unlawfully) respond at lower rates and thus diminish states' political representation. 139 S. Ct. 2551, 2556 (2019). The Court found the theory did not rest on "mere speculation" because evidence showed noncitizens historically responded at lower rates, likely due in part to their reluctance to answer a citizenship question. *Id.* Here, Plaintiffs' theory of standing is not "counterintuitive," *California*, 141 S. Ct. at 2119, nor does it rest on "'speculation' or 'guesswork' about [hunters'] motivations," *Mendia*, 768 F.3d at 1013. Rather, Plaintiffs provide evidence from hunters, hunting operators, and the Service, Robinson Decl. ¶¶ 14-18, that many hunters' decision to take a trophy is "likely attributable at least in part" to their ability to import it, *DOC*, 139 S. Ct. at 2566. Caselaw does not require Plaintiffs to provide more—such as evidence of cancelled hunts in this case, SCI Br. at 15—to demonstrate causation. This Court "need not be *certain* how [hunters] will respond." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 750 (9th Cir. 2020) (emphasis in original) (citation omitted). SCI's mere assertions—without evidentiary support—fail to establish "hunters will roll the dice" and act unpredictably. SCI Br. at 16.

Nor does SCI's reliance on the Service's shift to a case-by-case permitting system defeat redress. Hunters have always assumed "an individual risk of non-importation," SCI Br. at 16, because the Service has always represented, under *both* the prior country-wide system and the current case-by-case system, that new information may change its position,

*see, e.g.*, *SCI v. Jewell*, 76 F. Supp. 3d 198, 202 (D.D.C. 2014) (under the country-wide system and following a ban, the Service "'continue[d] to accept permit applications'" and consider "'new or additional information showing . . . sustainability'" on "'a case-by-case basis'" (citing NDF)); *Ctr. for Biological Diversity v. Zinke*, No. 17-2504, ECF No. 42-1 (D.D.C.) (memo announcing shift to case-by-case findings noting "the Service intends to use . . . information it receives"). Moreover, under the current case-by-case regime, trophy hunters' belief that an administrative hold was placed on elephant trophy permits was enough to lead some to decide not to hunt. *See* Robinson Decl. ¶ 17 (hunting group director declaring "the USFWS 'hold' has decreased American hunters['] willingness to participate in legal, well regulated hunting in Africa"). Additionally, changes to trophy permitting are rapidly disseminated to hunters, Robinson Decl. ¶¶ 20-26, and hunters react in kind, negating any impact of the shift to case-by-case permitting. It is the desire to bring a trophy home that matters, not the legal regime. And as the record shows, applicants have no reason to think their applications will be denied. Supra at 11. Plaintiffs have "come forward with [] relevant evidence," *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1017 (9th Cir. 2021) (citing *DOC*, 139 S. Ct. at 2563-64), to show that hunters respond in predictable ways to the Service's issuance of permits on a case-by-case basis.

Further, a favorable declaratory ruling will likely redress Plaintiffs' injuries because it will result in the Service issuing negative NDFs or, for positive NDFs to be issued, leopard management would need to be improved or information generated. Either way, imports are likely to pause, reducing trophy hunting and benefiting Plaintiffs' aesthetic interests. Given the significance of the U.S. market, it is very likely exporting countries will adopt changes to ensure U.S. leopard trophy imports continue. *See* Fick Decl., ECF No. 12-6, ¶ 15; Clements Decl., ECF No. 12-7, ¶ 12; Telecky Decl. at 8, 10; *see also Skyline Wesleyan Church*, 968 F.3d at 750-51 (finding redress even where the causal chain depended in part on the actions of third parties where requested relief could influence those parties' actions); 1st MTD Order, at 4-5. *Cf. Renee v. Duncan*, 686 F.3d at 1013 (court can redress injury even if, on remand, "the agency . . . might later . . . reach the same result for a different reason").

Equally unavailing is SCI's argument that the Service's conduct on remand—should the Court rule in Plaintiffs' favor—is too speculative to establish redressability. SCI Br. at 16. SCI's reliance on *Levine v. Vilsack* is misplaced. There, plaintiffs challenged actions under one statute, but full relief required agency action under a *different* statute. 587 F.3d 986, 993 (9th Cir. 2009). Here, the Service, on remand, will be implementing the same regulation, 50 C.F.R. § 23.61, that is the basis of Plaintiffs' claims. Nor do Plaintiffs need to challenge the NDF regulations themselves to obtain full relief. Seeking declaratory relief that the Service is violating 50 C.F.R. § 23.61 is sufficient as described above.

Defendants' remaining redressability arguments also fail. Re-invoking arguments this Court considered and rejected when it held the mootness exception applies, Defendants argue several permits: (1) expired without import after this case was filed; (2) were used and surrendered after this case was filed; or (3) were issued for hunts that were rescheduled. Defs. Br. at 10 n.8, 11-12; SCI Br. 8, 8 n.6; Clare Decl.(category "E"); Morgan Decl., ECF No. 67-1, ¶¶ 6, 8; 2d MTD Order at 12-13.[12] The Service's actions are too short in duration for the Court to review and set them aside, but declaratory relief can still redress Plaintiffs' injuries because the Service's unlawful NDF-making will likely continue until such relief is obtained. *Fikre v. FBI*, 904 F.3d 1033, 1040-41 (9th Cir. 2018) ("the question is no longer "whether the precise relief sought at the time [the case] was filed is still available" (internal citations omitted)); *accord Wolfson*, 616 F.3d at 1053-54. For the same reason, setting aside and rescinding permits, Defs. Br. at 11-12, is a non-issue because the Service's actions are too short in duration for judicial review (but are capable of repetition).[13]

**B. Jurisdiction Existed at the Outset of This Case, and the Claims Are Ripe and Not Programmatic**

---

[12] The Service reports the permit reflected in AR105 expired in 2020, Morgan Decl. ¶ 8.c, but the permit in the record expired in 2021, AR105:3138. SCI suggests the hunt reflected in AR106 "never took place." SCI Br. 8 n.6. While the hunt did not happen as scheduled because of Covid, the applicant reapplied for a hunt in 2021. AR106:3164-65.

[13] While the question of the Service's recission authority is now or will soon be moot, Plaintiffs disagree that the agency lacks the ability to rescind a permit where the underlying NDF has been declared illegal. *See* 50 C.F.R. § 13.28(a)(4), (5).

14

Defendants' ripeness, final agency action, and programmatic challenge arguments all ignore the very salient fact that Plaintiffs' claims challenge numerous final agency actions.

### 1. Plaintiffs' Claims are Ripe, and They Challenge Final Agency Actions

The agency actions before the Court are final and ripe for review. Defendants do not deny this with respect to multiple permits at issue in this case, and thus the Court can reach Plaintiffs' three claims. Nevertheless, SCI advocates for dismissal of several permits—without any legal support or explanation—because they were issued after Plaintiffs filed their relevant complaints. SCI Br. at 8; Clare Decl. (category "D"). Issuance of these permits was not necessary for Plaintiffs to establish their claims at the outset of the case, and having issued, they are now ripe for review.

Dismissing now-final agency actions is nonsensical. When they filed this suit, Plaintiffs established a cause of action under the APA for each claim as multiple NDFs and permits were final at that time. Thus, Plaintiffs stated three claims, satisfied the APA's review provisions, 5 U.S.C. §§ 706, 704, and established subject matter (i.e., federal question and Article III) jurisdiction at filing, so there is nothing to dismiss. *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830 (9th Cir. 2002) (lack of final agency action "is not a defect in subject matter jurisdiction") *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008); *Gallo Cattle Co. v. USDA*, 159 F.3d 1194, 1200 (9th Cir. 1998) (APA does not "independently confer jurisdiction").[14] And contrary to SCI's arguments, the issue is not one of standing but ripeness. *Colwell v. HHS*, 558 F.3d 1112, 1123 (9th Cir. 2009) ("'standing is primarily concerned with who . . . ripeness addressees when'" (citation omitted)).

---

[14] A "conflict" exists in the Ninth Circuit over whether a lack of final agency action is failure to state a claim or lack of subject matter jurisdiction. *See Hsiao v. Stewart*, 527 F. Supp. 3d 1237, 1246 n.6 (D. Haw. 2021) (explaining the conflict); *see also Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010) (noting need to "curtail such 'drive-by jurisdictional rulings'" (internal citations omitted)). Regardless, neither is an issue here since Plaintiffs' claims encompassed final agency actions ripe for review at filing. For this same reason, sovereign immunity was waived. *Navajo Nation v. DOI*, 876 F.3d 1144, 1168 (9th Cir. 2017) ("each claim against the government must rest upon an applicable waiver of immunity"); *Gallo Cattle Co.*, 159 F.3d at1198 (APA "provides a waiver of sovereign immunity in suits seeking judicial review of a federal agency action under [28 U.S.C.] § 1331").

As "'[r]ipeness is peculiarly a question of timing,'" *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022), it "is assessed based on the facts as they exist *at the present moment*," *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1205-06 (9th Cir. 2008) (emphasis added). The Ninth Circuit does not apply the ripeness doctrine rigidly. *Pizzuto v. Tewalt*, 997 F.3d 893, 900 (9th Cir. 2021) (finding ripeness where Plaintiffs would otherwise be caught between "an unsolvable dilemma" of filing "too early" or being "too late"). Ripeness includes "both constitutional and prudential aspects," the former coinciding "squarely with standing's injury in fact prong" and the latter examining fitness for review and hardship from delay. *Pizzuto*, 997 F.3d at 899. Here, constitutionally, this matter is capable of repetition, yet evading review. 2d MTD Order at 12-13.[15] Prudentially, the applications to which SCI points ripened into final permits and NDFs, putting the "agency's decision . . . 'at an administrative resting place.'" *Cottonwood Envtl. Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1083-84 (9th Cir. 2015) (citation omitted); *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869-70 (9th Cir. 2022) (ripeness arguments echoing final agency action points "raise concerns of prudential ripeness"). And now-ripe final agency actions are reviewable. *See Martinez v. Barr*, 941 F.3d 907, 919-20 (9th Cir. 2019) ("precedent supports the ripening of premature appeals in cases involving a variety of non-final orders"); *Buckley v. Valeo*, 424 U.S. 1, 14-17 (1976) (reversing appeals court decision that certain claims were not ripe because, before the Supreme Court decision, agency action had been taken). Thus, with the record for these decisions before the Court, they are "now" ripe. *Garland*, 42 F.4th at 1086.

## 2.  Plaintiffs Seek Review of Final Agency Actions, Not A Program

Defendants argue this case is an impermissible programmatic challenge. Defs. Br. at 13-16; SCI Br. at 17 n.11; *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639

---

[15] When the case was filed, Plaintiffs brought "'allegation[s] of future injury,'" which are sufficient to confer standing if "'there is a substantial risk that the harm will occur.'" *Ree v. Zappos.com, Inc.*, 888 F.3d 1020, 1026 (9th Cir. 2018) ((citation omitted)); *see also DOC*, 139 S. Ct. at 2565. Plaintiffs sufficiently pled standing to pursue these then imminent, now final, import authorizations. AR129; AR117; AR131; AR136; AR137; AR152.

1   (9th Cir. 2004) (explaining, in its ripeness analysis, "the APA does not allow 'programmatic'

2   challenges . . . but instead requires that there be a specific final agency action" (citation

3   omitted)). This case does not challenge the "CITES import permit program," Defs. Br. at 15,

4   but raises three claims alleging that by "issuing positive [NDFs] and import permits"—

5   discrete agency actions—the Service acted arbitrarily and contrary to law, Am. Compl. at

6   57-62. In so doing, Plaintiffs direct their "attack against some particular agency action that

7   causes [] harm," not a "broad programmatic attack." *Whitewater Draw*, 5 F.4th at 1010

8   (citations omitted). Plaintiffs' reliance on the cascading effects of leopard trophy hunting,

9   Defs. Br. at 15, also is not programmatic but demonstrates a harm caused by the Service's

10   actions. Supra at 7-8 (discussing record evidence on leopard trophy hunting impacts).

11       The fact that Plaintiffs challenge more than one final agency action does not convert

12   this action into a programmatic one. *See High Sierra Hikers*, 390 F.3d at 639 (challenge to

13   multiple "special-use permits" in two forests not programmatic). Likewise, Plaintiffs do not

14   seek "programmatic relief," Defs. Br. at 14, simply because they seek prospective relief

15   under a mootness exception, *Wolfson*, 616 F.3d at 1053-54. Given the posture of this case,

16   Plaintiffs demonstrate that the Service is repeating the illegalities challenged in Plaintiffs'

17   claims to support their request for declaratory relief (and redress Plaintiffs' injuries, supra at

18   17). That Plaintiffs seek declaratory relief directed at the common legal flaws in the Service's

19   NDFs does not convert Plaintiffs' challenge to a programmatic one.

20       Nevertheless, the Service suggests—without legal support—that Plaintiffs must usurp

21   this Court's limited resources by making their full legal arguments NDF-by-NDF, even

22   where NDFs suffer from identical legal flaws. Defs. Br. at 15.[16] Plaintiffs pled three legal

23   claims based on the Service's repeated legal violations in the NDFs at issue, Am. Compl. at

24   57-62, and briefed summary judgment accordingly. In these circumstances, there is no

25   obligation to address each near-identical agency action independently or to brief each

26   separately. *See High Sierra Hikers Ass'n*, 390 F.3d at 630, 646-48 (finding agency violated

27   the law without analyzing the violation on a permit-by-permit basis).

28   _____

[16] A condition unheeded by the Service. Defs. Br. at 32 n.23 (pointing to "single exemplar").

17

1    The Service also alleges that Plaintiffs fail to address *the permits*, Defs. Br. at 13, and

2    "barely mention[ ] any individual NDF," *id.* at 15. But Plaintiffs' legal claims are based on

3    the legal failings of *the NDFs* that provide part of the agency's justification for permit

4    issuance. Am. Compl. at 57-62. In other words, there is little for the Court to review in the

5    permits themselves as the NDFs contain the agency's reasoning. Moreover, Plaintiffs'

6    motion contains numerous citations to the NDFs at issue, as well as analysis distinguishing

7    between NDFs issued for different countries and between NDFs issued before and after this

8    lawsuit commenced. Pls. Br. at 16-32.[17] That the Service issues NDFs and permits that

9    serially fail to use the best available science and sufficient information about leopards to

10   consider the NDF factors—thus rendering each NDF before the Court subject to the same

11   legal flaws—is a recurring situation of the agency's own making, not evidence of a

12   programmatic attack. Finally, Plaintiffs have not failed to argue or support any of their

13   claims, despite Defendants' implication to the contrary, Defs. Br. at 16, because Plaintiffs'

14   arguments focus on the NDFs' oft-repeated deficiencies.

15   ## II.   The Service Failed to Base Its Import Authorizations on the Best Available Science and Lacked Sufficient Information to Find Non-Detriment

16   Under 50 C.F.R. § 23.61, the Service must "base" its NDFs on the best available

17   science and "consider whether" the NDF factors are met. Pls. Br. at 16-33. The agency

18   violated this regulation and acted arbitrarily by issuing positive NDFs without relying on the

19   best available science or having sufficient information. To defend its conduct, the Service

20   chiefly relies on deference, suggesting that if a study is in the record, it was considered, Defs.

21   Br. at 21-22, and the availability of "any" information, *id.* at 27 (emphasis in original),

22   supplies a sufficient basis for a positive NDF. But the Service's regulations and caselaw

23

24   ---

     [17] As this Court recognized, "Plaintiffs have presented evidence that [the Service's] findings

25   and permits have been nearly identical . . . repeating the same alleged legal flaws challenged
     in the complaint." 2d MTD Order at 13. Now with the full record, it is apparent there are few

26   variations between NDFs issued for a country—with one notable exception. After Plaintiffs

27   sued, the Service tried to course correct by issuing updated NDFs, but even those updates
     resulted in little variation between the NDFs for a country, and the newer NDFs continue to

28   suffer from similar legal flaws as the older ones. Pls. Br. at 19, 21, 35.

demand more than the mere existence of *something* in the record, rather the agency must "base" its NDF on the science and if "[]sufficient information" is lacking, the Service cannot issue a positive finding. 50 C.F.R. § 23.61(f), (f)(4). While agencies need not "produce an aimless commentary on the raw evidence," there is still "an accepted distinction" between such commentary and findings that "illuminate the empirical bases of an agency's decision-making. *Amoco Oil Co. v. EPA*, 501 F.2d 722, 736 (D.C. Cir. 1974). Nor does "scientific uncertainty [] justify" the agency's conduct. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1072 (9th Cir. 2018) ("*CBD v. Zinke*") (internal citation omitted). The agency "must explain why uncertainty justifies its conclusion, 'otherwise, [the court] might as well be deferring to a coin flip.'" *Id*. The Service fails to meet its regulation and adequately explain its conclusions, so it is not entitled to deference.

## A. The Service Failed to Base Its Leopard Trophy Import Authorizations on the Best Available Science

The Service acted arbitrarily, capriciously, and contrary to its own regulation, which requires the agency to "base [NDFs] on the best available biological information" when evaluating trophy imports' biological impacts, including whether they represent "sustainable use." 50 C.F.R. § 23.61(c)(1), (f)(3). Plaintiffs do not ask the Court "to find the hunting at issue is unsustainable or poorly managed," SCI Br. at 19, nor must it to rule for Plaintiffs. Rather, the Court must determine whether the Service complied with its obligations under 50 C.F.R. § 23.61 and the APA.[18] Because the Service failed to acknowledge key scientific information in some NDFs and, in others, did not draw a rational connection between that science and its conclusions, Pls. Br. at 16-24, the Service did not rely on the best available science in determining whether trophy imports represent sustainable use.

### 1. The NDFs are Not Based on Science Concluding Trophy Trade Should be Limited to Leopards Older than Seven

The NDFs are not based on the best available science regarding age restrictions.

---

[18] The act of state doctrine is inapplicable. SCI Br. at 20 n.14. Plaintiffs challenge Service decisions, which "are reviewable for compliance with U.S. law," they do not ask the Court to "declare invalid an official act of a foreign sovereign." 2d MTD Order at 7.

Packer et al. (2009) and Balme et al. (2012) recommend strictly limiting trophy hunting to males older than seven to (1) ensure males can sire at least one litter of cubs (and contribute to the gene pool) and (2) reduce the risk of the accidental killing of females. Pls. Br. at 18-19. The record is replete with favorable citations to this powerful science. AR34:816; AR37:850; AR43:1671; AR54:1958; AR151:4100; *see also* ER3:10031. Despite this, the Service issued positive NDFs even though none of the range countries restrict trophy trade to males older than seven; in fact, Zimbabwean officials openly rejected that recommendation. Pls. Br. at 12-13, 18-20. This is troubling since "a high number" of young male leopards are hunted "across . . . Tanzania, Zambia and Zimbabwe." AR54:1958; AR43:1653 ("90% of all leopards shot" in Zimbabwe from 2013-2015 were "very young").

The Service failed to base its NDFs on this science, "ignor[ing] available biological information." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (citation and internal quotation marks omitted); Pls. Br. at 18-21. The majority of NDFs do not show that the agency even considered Packer et al. (2009) or Balme et al. (2012); those NDFs do not discuss these studies or include them in their list of literature cited. *See, e.g.*, AR100:2851-63; AR103:3095-107; AR105:3124-36; AR112:3363-75; AR118:3456-69. Later NDFs, all issued after Plaintiffs sued, do nothing more than perfunctorily acknowledge the studies. AR117:3434, 3439; AR129:3590; AR131:3690; AR136:3766; AR137:3827, 3833; AR152:4139. The Service repeatedly suggests that it need only "consider" the science and that a study's inclusion in the record is sufficient to show it has done so.[19] *See, e.g.*, Defs. Br. at 19, 21-22. But 50 C.F.R. § 23.61(f) requires the agency to "base" its NDFs on the best available science. 50 C.F.R. § 23.61(f)(3); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014) (under a similar requirement, the Service must "base its actions on evidence supported by 'the best scientific and commercial data

---

[19] The studies cited in an NDF are the best indicator of what the Service actually considered in issuing a particular NDF. The agency cannot later add something to the record and then point to it to make up for its failure to base an NDF on such science at the time that decision was made. *Cf. Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1141 (9th Cir. 2008) ("courts may not accept [] counsel's post hoc rationalizations for agency action").

20

available'" (citations omitted)). To that end, the agency must evaluate the best available science in its decisions. *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1008 (D. Ariz. 2011) ("*CBD v. Salazar*") (where challenged action did "not analyze or even mention climate change" the existence of "information *in the record*" about such impacts did not meet the standard (emphasis added)) (cited in Defs. Br. at 19). *Cf. Kern Cnty.*, 450 F.3d at 1081 (requirement met where rule cited studies and "thoroughly evaluated and incorporated" data from them).

Importantly, the Service must "articulate[] a rational connection between the best available science and its conclusion[s]." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 739 (9th Cir. 2017); *CBD v. Salazar*, 804 F. Supp. 2d at 1010 (action arbitrary and capricious when it "contain[ed] conclusions that are not supported by the record" or best available science) (cited in Defs. Br. at 19). Here, the record shows: (1) scientists recommend limiting leopard trophy hunting to males older than seven, particularly where population sizes are unknown, AR24:562, AR28:717; (2) the range countries do not implement this recommendation *or* have reliable information about their leopard populations, infra 28-29; and (3) none of the NDFs grapple with the need for—and lack of—age limitations when assessing whether the trophy trade represents sustainable use. In its NDFs, the agency does not disagree with Packer et al. (2009) or Balme et al. (2012) or offer alternative research suggesting hunting younger leopards is sustainable. *CBD v. Zinke*, 900 F.3d at 1068 ("Although FWS is free to choose among experts, it must acknowledge that it is doing so" (citation omitted)). Nor does it explain how trophy trade can "maintain[] wild populations at biologically viable levels for the long term," 50 C.F.R. § 23.5, when range countries have not followed recommendations for "dramatically reduc[ing] the risk of unsafe harvests," AR28:717. Because there is a "disconnect between the studies . . . and [the Service's] conclusions," the Court need not defer to the agency's expertise. *Greater Yellowstone Coal., Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1119 (D. Mont. 2009), *aff'd in relevant part*, 665 F.3d 1015 (9th Cir. 2011).

Unable to justify its decisions based on its stated findings, the Service tries—but

fails—to discredit both studies in briefing. First, the Service suggests Plaintiffs "overstate" Packer et al. (2009) and that the minimum safe age is six to seven. Defs. Br. at 17. This is a distinction without a difference because the Service has provided no evidence that hunting is limited to individuals older than six. Further, numerous scientific sources summarize Packer at al. (2009) as recommending a minimum safe age of seven. *See, e.g.,* AR54:1958; AR151:4100 (Dr. Packer is lead author). Next, the Service wrongly argues Balme et al. (2012) did not assess "whether implementing a seven-year age limit for trophy leopards would reduce unsafe harvest." Defs. Br. at 17. Yet, the authors conclude that "[a]ccording to our survey results, stipulating a minimum trophy age of ≥ 7 years for male leopards will essentially eliminate the possibility of hunters mistakenly harvesting females." AR28:721. Finally, even though the Service offered no critique of either study in its NDFs, the agency and SCI attempt to question them post hoc.[20] Defs. Br. at 18; SCI Br. at 4, 21. But the Service "cannot rely on its briefing" to explain why it ignored these studies; that "explanation must be evidenced from the [NDFs]." *CBD v. Zinke*, 900 F.3d at 1069 (citation omitted).

Next, the Service punts its obligations to the range countries, arguing they have "reached their own conclusions" about the sustainability of hunting younger leopards. Defs. Br. at 19. But the Service must make its own NDFs; it cannot blindly accept exporting countries' findings.[21] Infra at 32-33; *see also* 72 Fed. Reg. 48,402, 48,430 (Aug. 23, 2007);

---

[20] The Service suggests aging leopards might be infeasible, Defs. Br. at 17-18, but several NDFs explain that "methods for age estimation using photographs may help facilitate identification of older-aged individuals," *see, e.g.*, AR152:4139. SCI's effort to undermine Packer et al. (2009) by observing that Dr. Packer wrote the report underpinning Tanzania's Conservation Action Plan, SCI Br. at 4, is also unconvincing. That report is based on a workshop held *in 2006*, AR21:401—years before Packer et al. (2009) was published—and thus unsurprisingly does not account for this science. That Tanzania's conservation plan predates both studies belies SCI's argument that only "back in the day" hunting was unsustainable. SCI Br. at 22. Indeed, there is evidence the unsafe hunting practices continue. *See, e.g.*, AR54:1958; infra at 25 (discussing hunting with dogs in Zimbabwe).

[21] That two leopards were aged to be older than seven does not remedy this violation since U.S. imports are not conditioned on the leopard's age. *See* AR131:3698; AR152:4147. Further, these examples only highlight the Service did not know the age of other authorized trophy imports.

AC30 Inf. 23 (Ex. B) Pls. Req. for Judicial Notice, ECF No. 64-2 (raising concerns about countries' "sustainability" metrics during CITES quota review). Moreover, the NDFs provide no evidence that the alleged "sustainability" metrics—body length in Tanzania, limiting hunting to "adults" in Zambia, and skull size and a "points" system in Zimbabwe— are sufficient proxies for the recommended age limit. *See, e.g.*, AR129:3589-3604; AR137:3826-41; AR152:4138-51. Nor could they. Balme et al. (2012) found that a leopard's dewlap, a loose fold of skin on the neck, is "a particularly reliable indicator of males ≥ 7 years," AR28:716, but makes no mention of body length or skull size being reliable predictors of age, *see generally* AR28. In fact, "ample evidence [] show[s] that skull size can be misleading" as an indicator of age.[22] AR43:1687. And body length only predicts whether a leopard is fully grown—i.e., is an adult, not a juvenile. AR54:1998 (minimum body size avoids hunting of leopards younger than four). Limiting hunting to "adults" or vague "age-based" restrictions—with zero specificity as to what ages can be hunted—does not equate to a seven-year-old male age limit. Pls. Br. at 20. Finally, Defendants are flat wrong that Zimbabwe's point system is a sufficient age restriction. Defs. Br. at 18-19; SCI Br. at 21-22 n.15. Balme et al. (2012) recommended that if "unsuitable trophies," defined to include *males younger than seven*, are taken, then the quota should be reduced the following year. AR28:721. In stark contrast, Zimbabwe's system maintains or *increases* quotas when males aged four to six— "unsuitable trophies"—are killed. AR43:1693; Pls. Br. at 12-13, 19.

## 2.  Tanzania NDFs are Not Based on Science Showing that Females are Likely Hunted

Available biological information shows females are being hunted, even though this poses a conservation threat. AR28:721; AR37:850; Pls. Br. at 21. The Service incorrectly argues Spong et al. (2000)—which found 28% of leopard trophies sampled in Tanzania were female, AR11:61—is the only data set evidencing this, Defs. Br. at 20. But Balme et al. (2012), published more than a decade later, similarly found "a remarkable number of hunted

---

[22] Although Zimbabwe no longer relies on skull size to age leopards, AR146:4020, the Service issued at least one NDF relying on this requirement, AR117:3442.

female leopards," including in Tanzania. AR28:721, 723 (Figure S4 includes Tanzania). The authors recommend limiting hunting to males older than seven to "essentially eliminate" the accidental hunting of females who are easily confused with younger males. AR28:721. Because the recommendation has not been implemented, females remain at risk.

The NDFs for Tanzania all fail to consider a "remarkable number" of females are killed, AR28:721, and only two cite Spong et al. (2000), AR105:3124-36; AR110:3273-85; AR111:3294-306; AR112:3363-75; AR129:3595 (referencing Spong et al. (2000)); AR131:3695 (same). The two NDFs citing Spong et al. (2000) note Tanzania has not reported the hunting of females recently, ignoring the study's evidence that the killing of females likely goes unreported because female trophies were marked—i.e., *reported*—as males. AR11:61. The Service cannot selectively rely on Spong et al. (2000), ignoring "other aspects of the [Spong] study [that] contradict[] the data on which [it] relied." *CBD v. Zinke*, 900 F.3d at 1068. By doing so, the Service's Tanzania NDFs "ignore[d] available biological information" in assessing whether the trophy trade represents sustainable use. *Kern Cnty.*, 450 F.3d at 1080-81. The NDFs' passing observation that the hunting of females may be "underappreciated," Defs. Br. at 20, fails to "thoroughly evaluate[] and incorporate[]" the scope of the studies' findings, *Kern Cnty.*, 450 F.3d at 1081. And the Service has begun conditioning NDFs for Zambia and Zimbabwe to ensure imports are male, presumably to curtail the risks from hunting of females. *See, e.g.*, AR137:3836 AR152:4147. This practice underscores its failure to "articulate[] a rational connection between the best available science and its conclusion[s]" for the Tanzania NDFs, *Turtle Island*, 878 F.3d at 739, which are not so conditioned despite the risks in that country.[23]

---

[23] The Service's assertion that there is evidence that some leopards killed are male does not remedy the violation. Defs. Br. at 19. This assertion is unsupported for several applicants. AR105:3118-22, 3127 (NDF indicates request is for male leopard, but application does not provide sex); AR110:3264-68, 3276 (same); AR111:3288-92, 3297 (same). And, notably, the Service conditioned NDFs for Zambia and Zimbabwe on the leopard being male even when there was evidence the leopard hunted was male or the applicant requested import of a male leopard. AR137:3792, 3836; AR152:4105, 4147.

### 3.  Zimbabwe NDFs are Not Based on Science Regarding the Dangers of Using Dogs to Hunt Leopards

Information in the record makes clear that using dogs to hunt is risky because it makes it easier to kill leopards—potentially masking population declines—and that Zimbabwe has not limited this dangerous practice. Pls. Br. at 21-22. The NDFs for Zimbabwe imports do not evaluate the associated risks. *Id.* at 22. The Service argues that hounding is not widespread, citing a lone comment during a 2016 leopard workshop in Zimbabwe. Defs. Br. at 21 (citing AR43:1690). That isolated comment is contradicted by a survey presented at the same workshop, which found that "59% of [professional hunters] have hunted with hounds." AR43:1666; AR151:4092 (identifying concern about "[t]he growing use of dogs to hunt leopards in Zimbabwe"). Indeed, Zimbabwe recognized hounding was a problem in 2012 and again in 2016, but following the 2016 workshop, the country did not ban or limit the practice. Pls. Br. at 22; AR137:3831 (Service acknowledging only "some" of the 2012 management recommendations have been addressed). Further, the fact that "none of the nine NDFs for trophy imports from Zimbabwe . . . shows that any of the applicants sought to utilize dogs," Def. Br. at 21, ignores that the Service's permit applications do not *ask* whether applicants intend to use dogs, *see, e.g.*, AR101:2866-70. The agency splits hairs in arguing Packer et al. (2009) did not study the effects of hounding, Defs. Br. at 21, when that study and others explain the risks, AR31:780; AR43:1672; AR151:4092, and the Service identifies no contradictory evidence. Finally, the mere inclusion of documents in the record, Defs. Br. at 21-22, does not establish that the Service satisfied its obligation to base its NDFs on the available science. *Turtle Island*, 878 F.3d at 739; *CBD v. Salazar*, 804 F. Supp. 2d at 1008.

### 4.  The NDFs are Not Based on Science Regarding Other Threats

Prey depletion and habitat loss are major conservation threats. Loss of prey is of concern given the prevalence of bushmeat hunting. Pls. Br. at 4-5 (humans and leopards compete for prey, with leopards' prey diminishing 56%). Despite the risks, the NDFs were not based on biological information indicating that prey availability (and thus loss of prey) impacts leopard population density and habitat use. AR113:3382 (Zimbabwe); AR133:3721

(Tanzania); ER8:10090, 10092 (Zambia); Pls. Br. at 22-23. To defend its conduct, the Service relies almost entirely on a single August 2022 NDF issued for a Zambian import that postdated the other NDFs. Defs. Br. at 23 (citing AR152:4141, 4145). The fact that the Service evaluated multiple studies related to the impacts of prey loss in this lone NDF only highlights its complete failure to do so in every other NDF. *See, e.g.*, AR100:2851-63; AR105:3124-36; AR131:3689-3704; AR136:3765-79; AR137:3826-41.[24] Similarly, even though science shows habitat loss from Zimbabwe's land reform program may have significantly impacted the country's leopard population, Pls. Br. at 4 (discussing program caused an estimated 58-69% population decline), the NDFs do nothing more than mention the threat, without evaluating its impact, *see*, *e.g.*, AR100:2851-63; AR137:3826-41.

Finally, none of the NDFs address how the legal trophy trade provides cover for illegally traded leopard specimens. Pls. Br. 23-24; *see also* Pls. Br. at 5-6 (describing study that found illegal trade adds 28% to legal trade volumes). The Service argues that it is not required to consider every "permutation" of illegal trade. Defs. Br. at 24. But 50 C.F.R. § 23.61 requires the agency to evaluate "cumulative risks" and whether the proposed imports would stimulate additional trade and risk to the species if so. 50 C.F.R. § 23.61(g), (e)(3), (f)(3). The Service, then, *is* required to assess the risks from this illegal leopard trade, using the best available biological information. *Id.* It has not done so.

**B. The Service Had Insufficient Information to Consider Whether the Required NDF Factors Are Met**

To make an NDF, the Service must "consider whether" delineated factors are met. 50 C.F.R. § 23.61. When it lacks "[ ]sufficient information" or cannot "satisfactorily address[]" the factors, the agency must "take precautionary measures" and issue a negative finding. 50 C.F.R. § 23.61(f)(4); *see also Franks v. Salazar*, 816 F. Supp. 2d 49, 59-60 (D.D.C. 2011). Yet here the Service argues its consideration of the factors using "any" information available satisfies its obligation. Defs. Br. at 27, 29. To the contrary, 50 C.F.R. § 23.61 specifies the agency must have *sufficient* information to consider whether the factors are met or deny the

---

[24] That these NDFs recognize the threat, but fail to analyze it, belies SCI and the Service's *post hoc* attempts to argue it is not a problem. Defs. Br. at 23-24; SCI Br. at 22.

1  request. 50 C.F.R. § 23.61(c), (f)(4). Thus, "[d]eference to the [Service's] interpretation is

2  not warranted because the plain language of this regulation is not reasonably susceptible to

3  the [Service's] . . . interpretation." *Turtle Island*, 878 F.3d at 734-35.

4         In adopting 50 C.F.R. § 23.61, the Service explained that, to issue a positive NDF,

5  "[s]ufficient evidence must exist to show that the level of trade will not be detrimental . . .

6  either because demand for the species can be sustained by the productivity of the species, or

7  there is adequate control on harvest and trade to prevent overexploitation." 71 Fed. Reg.

8  20,168, 20,196 (April 19, 2006). Previously, the agency concluded that it needs "'reliable

9  data about the proportion of [the animals] killed'" and "'[t]he status of populations in [the

10  country] . . . though scientific based research and reliable population surveys'" to meet the

11  standard. *Marcum v. Salazar*, 810 F. Supp. 2d 56, 75 (D.D.C. 2011) (quoting AR), *vacated

12  on other grounds*, 694 F.3d 123 (D.C. Cir. 2012). In other words, the Service has drawn a

13  line between what is sufficient and insufficient information; information is insufficient if

14  reliable population information and data on the proportion of the population killed are absent.

15  *Id.* Without this crucial information, the agency cannot consider whether overutilization,

16  long term declines, unsustainable use, or other NDF factors are met. *Id.* The Service's

17  discretion is cabined by 50 C.F.R. § 23.61, the agency's prior practices, and its obligation to

18  make reasoned decisions. *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("deference

19  accorded an agency's scientific or technical expertise is not unlimited").[25] As just evidenced,

20  this requirement comes from the agency's long-standing regulatory scheme, *see* 50 C.F.R. §

21  23.61(b), (c)(4), (g) (consider "the status of the species in the wild"), and is not a new "data

22  requirement[]," SCI Br. at 17. Here, the record is devoid of the information needed to

---

[25] The record reflects the need for population status and mortality data in managing trophy hunting and overexploitation. *See, e.g.*, AR44:1701 ("Robust estimates of distribution, population size, and threat" are "essential"); AR36:834 ("accurate data on leopard population density is therefore urgently required to facilitate responsible management"). A "court need not defer to an agency conclusion that runs counter to that of . . . other individuals with specialized expertise in a particular technical area." *NRDC v. Bernhardt*, No. 05-01207, 2019 U.S. Dist. LEXIS 30649, at *35-36 (E.D. Cal. Feb. 26, 2019) (citing *Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984)).

consider the relevant factors and ensure no detriment.

### 1. Population Status Information Is Insufficient

The Service admits that "[r]eliable data on leopard population trends is missing from large portions of the species' range." Defs. Br. at 27. But the agency incorrectly claims it can simply "consider any information available" on leopard populations in determining whether NDF factors are met. *Id*. (emphasis removed). While the Service points to site-specific monitoring data, *id*. at 27-28, the record shows such data cannot be extrapolated to generate overall population information, *see* AR90:2542 (noting concerns with using abundance estimates in lieu of rigorous population counts); Pls. Br. at 4 (summarizing record evidence). Site-specific information is insufficient alone because leopards can be drawn to a site following trophy kills, such that the site density seemingly remains stable but the overall population declines. AR54:1956; AR113:3383, 84; *see also* Pls. Br. at 28; 50 C.F.R. § 23.61(e) ("risk of extinction" is considered for "species as a whole" and "the population").

The sparse record reveals only guesstimates of population status. Zambia "estimated" leopard range and leopard density to "estimate[] the overall leopard population"—offering an estimate of an estimate. AR152:4141; Pls. Br. at 11. Similarly, Tanzania provides only site-specific density data. Pls. Br. at 10. As the Tanzania NDFs recognize, leopard density is variable, AR131:3692, and given that leopards are absent from some protected areas, *id*., the overall population estimates based on densities at certain sites are unreliable "guesstimate[s]," AR71:2187-88. Finally, Zimbabwe presents outdated, site-specific data but nothing more—despite the expected decline of its leopard population. Pls. Br. at 12. Using the site-specific data in the record to understand *overall* leopard status and consider the NDF factors is akin to guessing a final dish based on a few limited ingredients. In other words, site-specific data cannot stand in for the reliable population estimates.

Defendants rely on ESA Section 8a and related caselaw to argue that reliable population estimates are discretionary, not mandatory. Defs. Br. at 33; SCI Br. at 18-19. These arguments fail to acknowledge two distinguishing factors. First, Section 8a and *Defenders of Wildlife* only pertain to CITES Appendix-II species, not Appendix-I listed

leopards. 16 U.S.C. § 1537a(c)(2) (applies to determinations "under Article IV of the Convention"); *Defenders of Wildlife v. Endangered Species Scientific Auth.*, 725 F.2d 726, 728 (D.C. Cir. 1984) ("the bobcat is included in Appendix II of CITES").[26] Second, these authorities only prohibit the Service from requiring population data from *U.S. states*, not foreign nations. 16 U.S.C. § 1537a(c)(2) (Service cannot "require any State" to undertake certain estimates); *id.* § 1532(17) (defining "State" to include U.S. states and territories); *Defenders of Wildlife*, 725 F.2d at 728-29 (explaining that the case related to state population estimates). Moreover, Plaintiffs do not deny that the agency can, in the face of unreliable population information, rely upon "other information regarded as population indicia" to discern status. *Prima v. DOI*, No. 96-3578, 1998 U.S. Dist. LEXIS 2203, at *20 (E.D. La. Feb. 19, 1998).[27] However, here the record contains only limited site-specific data, not reliable population indicia, which are insufficient to consider the NDF factors. Supra at 28.

## 2. Mortality and Management Information Are Insufficient

To adequately consider the NDF factors, including whether trophy hunting is sustainable, would not harm the species, and is not detrimental overall, the Service needs some quantification of total leopard mortality. Pls. Br. at 29-31; 50 C.F.R. § 23.61(c). The Service argues that providing "the number of" trophy exports and "identify[ing]" other "sources of mortality" is somehow sufficient. Defs. Br. at 30. Yet, the NDFs fail to even quantify the total number of leopards killed by both residential and trophy hunters or evaluate the cumulative risks of all hunts. 50 C.F.R. § 23.61(g); Pls. Br. at 31. The NDFs further identify some other sources of anthropogenic mortality—human persecution, incidental snaring, illegal trade, and excessive harvesting for ceremonial skins, Pls. Br. at 5-6, 30—but

---

[26] Article IV pertains to Appendix-II species. CITES, art. IV. *Marcum*, to which the Service points, Defs. Br. at 27, explained that the fact the Service "'is not required to make . . . estimates of population size' . . . doesn't mean that it may not do so." 810 F. Supp. 2d at 76.
[27] These indicia include information that collectively "reflect[s] population trends"—such as "indices of population size, age and sex structure and harvest information"—that can aid the agency in "evaluating population status," *id.* at *19, but only when accompanied by other indices such as habitat occupancy, prey abundance, and presence of other carnivores that help provide an idea of how the species is faring. Such indicia are lacking here.

1   offtake is either not quantified or downplayed, *id.* at 10-13, 30. Particularly with leopard
2   populations thought to be declining in Zimbabwe and Zambia, AR93:2771, and the
3   documented increase of leopard poaching for the ceremonial skin trade in southern Africa,
4   AR90:2556, quantification of offtake is needed to ensure the NDF factors are met.

5       The Service argues requiring these data raises the bar too high because of leopards'
6   cryptic nature, Defs. Br. at 30, but the agency has previously said such data are needed,
7   *Marcum*, 810 F. Supp. 2d at 75 ("without data on the other sources of 'off-take,' agency
8   cannot "determine whether additional lethal take from sport hunting 'would not contribute
9   to the over-utilization of the species'" (quoting 50 C.F.R. § 23.61(b), (c), (e))). Nor can the
10  Service condemn the species to detrimental use simply because leopards' behavior makes
11  information collection challenging. Evaluating "biological impact," 50 C.F.R. § 23.61(f)(3),
12  requires more than just identifying threats to the species, "[e]xporting countries must conduct
13  some level of monitoring of productivity and impact of harvest to determine whether exports
14  are detrimental." 71 Fed. Reg. at 20,174.

15      In *Greenpeace Action v. Franklin*, cited by the Service, the Ninth Circuit held that to
16  rely upon "not dispositive" data, the agency must rely on "the analysis and opinion of experts
17  and employ[] the best evidence available." 14 F.3d 1324, 1336 (9th Cir. 1992). Here, it is
18  not simply that the mortality data is "not dispositive," Defs. Br. at 30, but, as discussed above,
19  the agency failed to consider the best available science, supra at 20-26. Moreover, throughout
20  the record, scientists stress the need for quantification of offtake. AR151:4092 ("[t]here is
21  an urgent need for quantitative analysis to establish sustainable harvest practices");
22  AR113:3379 (noting potential for "detrimental long-term impacts" when hunting is "carried
23  out unsustainably or combined with other sources of anthropogenic mortality"). Thus, the
24  Service's reliance on "not dispositive" data, Defs. Br. at 30, is not entitled to deference.
25  *Brower v. Evans*, 257 F.3d 1058, 1067-68 (9th Cir. 2001) ("presumption of agency expertise
26  can be rebutted when its decisions, while relying on scientific expertise, are not reasoned").
27  Without sufficient information on leopard status, recruitment, and overall mortality, the
28  Service cannot "consider whether" trophy hunting is sustainable, poses "no net harm," or

leads "to long-term declines" putting "viability" in question. 50 C.F.R. § 23.61(c)(2)-(5).

Section 23.61(c)(2) and (3) further highlight the need for quantification of mortality to "consider whether" "overutilization" is occurring. Under the regulations, if an exporter does not have "a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species," 50 C.F.R. § 23.61(c)(2), the Service must consider whether "the removal of the animal or plant from the wild would not contribute to the over-utilization of the species, considering both domestic and international uses," *id.* § 23.61(c)(3). Thus, it is the Service's regulations, not Plaintiffs, that insist on a formal plan. Defs. Br. at 32. To meet the management plan requirement, the Service looks for "a ratified" plan, with the weight of law, and information to ensure its implementation. *See Marcum*, 810 F. Supp. 2d at 63 (Service raising concerns over "lack of a ratified government management plan that 'carries the weight of law' and outlines specific information about how it will actually be implemented"); *id*. at 75 (Service rejected "National Policy and Action Plan on Elephant Management in Zambia," as "the product of a 'workshop,'" not "'an official document' of the government of Zambia"); *Franks*, 816 F. Supp. 2d at 54 (Service found "the [country's] National Strategy for the Management of Elephants in Mozambique . . . was merely the 'first step' in . . . implementing an effective wildlife management plan" and could not "verify whether Mozambique had an effective elephant management plan").[28]

The record shows management planning is ongoing in the exporting countries, but no ratified plans exist. Pls. Br. at 29. Thus, the Service must consider whether leopard "removal . . . would not contribute to the over-utilization of the species, considering both domestic and international uses." 50 C.F.R. § 23.61(c)(3). Again, the agency identifies some leopards uses, AR131:3695; AR136:3772-73; AR137:3834, but not all, and ultimately the NDFs fail to quantify or even estimate overall leopard mortality, Pls. Br. at 29-31. There is simply too little information for the agency to make positive findings to which the Court can defer.

### 3. Increased Extinction Risk and Leopard Recovery Were Not Considered

Leopards are Appendix-I species traded only under "exceptional circumstances."

---

[28] Tanzania's "generic" carnivore plan, Pls. Br. at 29, does not meet these standards.

CITES, art. II ¶ 1. Thus, under its regulations, the Service must *additionally* consider whether leopard trophy hunting increases the risk of extinction or interferes with leopard recovery in making NDFs. 50 C.F.R. § 23.61(e)(1), (2). The agency claims it "considered" these factors through "collective consideration of information in the administrative record" and the CITES process. Defs. Br. at 32. Yet, the bulk of the NDFs fail to address the issues at all, Pls. Br. at 32-33, with only the most recent NDFs even remotely exploring future leopard conservation activities, AR131:3691; AR137:3828; AR152:4140. Given the insufficient information in the record on leopard status and proportion of leopard mortality, the Service simply could not have considered extinction risk and recovery in its NDFs.

### 4. The Service Must Make Independent Findings and Not Defer to the CITES Quotas

In issuing NDFs, the Service cannot defer to the CITES quotas and the 2018 review thereof.[29] First, the Service's NDF regulations do not allow the agency to defer to CITES quotas. 50 C.F.R. § 23.61(h) (when export quota has been set for Appendix-I species, Service "will consider" the "basis of the quota" but "make [its] non-detriment finding"). Instead, the agency must make its own independent findings, which the Service acknowledges. Defs. Br. at 25 n.18. The need for independence is bolstered by the fact the CITES leopard quotas are based on "impossible" population overestimates discounted by scientists. AR90:2542; Pls. Br. at 7-9. The recent CITES quota review failed to raise this issue, nor did it critically evaluate the exporting country reports by delving into the paucity of information underpinning them. It was nothing more than political rubber stamping. ER11:10134-41.

Second, despite the Service's argument that "new scientific and management data"

---

[29] The CITES quotas are not scientifically based and lack the scientific underpinning necessary for the Service to rely on them. The record is replete with scientists critiquing the Martin and de Meulenaer model. Pls. Br. at 7-8. The Service's citation defending the model, Defs. Br. at 26 n.19, is taken out of context as the source explains the model "has been widely criticised for methodological reasons and the results are regarded as impossible overestimates" but "[d]espite this criticism, they are still sometimes used where more recent numbers do not exist on a nation-wide scale," AR90:2542. That nothing has supplanted the faulty model does not justify continued reliance on it and only emphasizes the need for sound science to inform quota setting and NDF-making.

were not identified, Defs. Br. at 26, the CITES process raised—but did not account for—new data, highlighting the need for independent NDFs. South Africa was the only exporting country that comprehensively monitored its leopard population, and it found an alarming 7-10% annual population decline—in a country once believed to be a leopard stronghold. AR102:2968; AR44:1717; AC30 Doc. 15, Annex 3, at 3 (Ex. C), Pls Req. for Judicial Notice, ECF No. 64-3; ER11:10136-37.[30] The review also surfaced evidence suggesting demand for skins for ceremonial purposes is "likely having a regional impact on leopards in southern Africa." AC30 Inf. 23, at 3 (Ex. B), Pls. Req. for Judicial Notice, ECF No. 64-2; AR90:2556. Thus, even if the Service deferred to CITES quotas (which it does not, 50 C.F.R. § 23.61(h)), the agency can no longer rely on the exporting countries' reports claiming no detriment given these developments, which were not accounted for, *see* AR71-73; *see also* 72 Fed. Reg. at 48,430 (agency not required "to accept imports of Appendix-I species blindly" where there is an "approved a quota"). These developments—which the NDFs fail to account for[31]—make clear that the agency's deference and reliance upon the CITES process was unfounded.

Likewise, the fact that some exporting countries issue fewer leopard licenses than their CITES quotas, Defs. Br. at 26-27, only affirms those quotas are unsustainably high and the result of an unscientific process not worth the Service or this Court's deference, *see, e.g.* AR36:834 ("repeated failure to achieve the annual quota . . . raises the fear that leopard hunting in Zimbabwe may be unsustainable"). For all these reasons, the Service cannot defer to the CITES process to ensure that the leopard trophy trade is not detrimental.

**C. Insufficient Information and Inadequate Consideration of NDF Factors Requires the Service to Take Precautionary Measures**

In making NDFs, the Service is required to employ a precautionary approach, giving the benefit of the doubt to imperiled species, in keeping with CITES conservation aims. 50

---

[30] SCI's "land tenure" and differing "systems" points, SCI Br. at 22, do not undermine that the South Africa results illustrate why reliable population assessments are a critical component of assessing whether trophy hunting is detrimental to the species.
[31] NDFs for Zambia and Zimbabwe note an analysis of "illegally traded individual leopard skins from South Africa" found 8% and 40% likely originated from those countries respectively, AR152:4141; AR137:3834, but fail to quantify the related offtake of leopards.

1   C.F.R. § 23.61(f)(4); 71 Fed. Reg. at 20,196 ("We use precautionary measures when a review

2   of the available information reveals an absence of essential data as to the intensity of the

3   effect of the proposed trade on the status of the species in the wild"). The record reveals that

4   essential data needed to understand leopard status and to evaluate the effect of trophy hunting

5   on leopards in Tanzania, Zambia, and Zimbabwe are missing or insufficient. Supra at 28-31.

6   Nevertheless, the Service still issues positive NDFs authorizing leopard trophy imports.

7        The agency responds that it has discretion to decide when to take precautionary

8   measures. Defs. Br. at 33. Under the plain language of the Service's regulation, it does not.

9   50 C.F.R. § 23.61(f)(4) ("In cases where insufficient information is available or the factors

10  above are not satisfactorily addressed, we take precautionary measures and would be unable

11  to make the required finding of non-detriment."). Indeed, the Service skips from statutory

12  language—providing authority to "do all things necessary and appropriate to carry out the

13  [Scientific Authority] functions," 16 U.S.C. § 1537a(c)(1)—to "may" language in a Federal

14  Register notice, conveniently ignoring the regulation's mandatory language. Defs. Br. at 33.

15  The Service's litigation position on the regulatory meaning is erroneous. *See Oregon Nat'l*

16  *Desert Ass'n v. BLM*, 531 F.3d 1114, 1141 (9th Cir. 2008) (cannot "accept [] counsel's post

17  hoc rationalizations for agency action"); *see also Turtle Island*, 878 F.3d at 735.

18       Prior cases evidence that the Service previously more closely aligned its NDFs with

19  its regulatory obligations than it did here. Pls. Br. at 33-34. The Service argues these cases

20  illustrate its "discretion." Defs. Br. at 33. To the contrary, they demonstrate the searching

21  reviews the agency typically conducts but that are absent in the NDFs at issue here. *See*

22  *Marcum*, 810 F. Supp. 2d at 76 ("even if Zambia had an accurate population count or estimate

23  for its elephant population [which it did not], FWS would still be unable to determine that

24  sport hunting is sustainable without also knowing the impact on that population of other

25  sources of 'off-take'"); *Franks*, 816 F. Supp. 2d at 62-63 (Service could not consider "over-

26  utilization" or "net harm," where it "lacked 'sufficient information' to make these findings,"

27  namely "elephant population" information). The agency further asserts that these cases' facts

28  "are markedly different" and cherry-picks lowlights from each. Defs. Br. at 33-34. These

arguments do not alter that the Service has previously insisted that it needs sufficient population status and offtake information—and without such information, the agency did not make positive NDFs. Indeed, such information was required in *Marcum* and *Franks* for Appendix-I listed African elephants, which generally are believed to be more abundant than leopards. *See, e.g.*, *Marcum*, 810 F. Supp. 2d at 61 ("Zambia's elephant population had fallen below 18,000"). Further, the record here also includes areas of concern. *See, e.g.*, AR54:1956 ("Wildlife authorities of . . . Tanzania, Zambia and Zimbabwe have substantive amounts of their operational costs financed by . . . trophy hunting" which can "create conflicts of interest" that can result in "population declines"); AR54:1981 (discussing corruption concerns in Tanzania); AR54:1984-85 (same for Zambia); AR54:1986 (same for Zimbabwe); AR90:2556 (discussing leopard poaching and excessive skin harvesting).

The agency's shift, in a few recent NDFs issued after Plaintiffs brought this lawsuit, to imposing conditions, AR152:4147; AR137:3836; AR131:3698; AR129:3598; AR117:3442, shows the agency recognizes there are concerns with the leopard trophy trade. But adding a condition is not the same as invoking the precautionary approach the agency adopted in its regulations. 71 Fed. Reg. at 20,196; Pls. Br. at 35. In sum, the record shows, the Service simply lacks sufficient information regarding the status of leopard populations and offtake to consider whether the required NDF factors are met. Thus, the agency should *not* have approved the leopard trophy imports at issue.[32]

## CONCLUSION

For the foregoing reasons and those in Plaintiffs' Motion for Summary Judgment, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

---

[32] SCI objects to Plaintiffs' request for judicial notice of CITES information documents. SCI Br. at 23 n. 17. Plaintiffs do not ask the Court to notice any facts that may be disputed, rather they ask the Court to "take judicial notice of the[ir] existence and content." 2d MTD Order at 6 n.1; *see also Davidson v. O'Reilly Auto Enterprises, LLC*, 968 F.3d 955, 974 n.5 (9th Cir. 2020). These documents are publicly available and were available to the CITES Parties, including the information and critiques within them, so they may be judicially noticed.

1    DATED: January 26, 2023                    Respectfully submitted,

2                                               /s/ Tanya Sanerib

3                                               Tanya Sanerib (DDC Bar No. 473506)
                                                Phone: (206) 379-7363
4                                               Email: tsanerib@biologicaldiversity.org

5                                               Sarah Uhlemann (WA Bar No. 41164)
                                                Phone: (206) 327-2344
6                                               Email: suhlemann@biologicaldiversity.org

7                                               Center for Biological Diversity
                                                1037 NE 65th Street, #128
8                                               Seattle, WA 98115

9                                               *Admitted Pro Hac Vice*

10                                              Margaret Robinson (DDC Bar No. 241415)
                                                Phone: (434) 260-4871
11                                              Email: mrobinson@humanesociety.org

12                                              Nicholas Arrivo (CA Bar No. 296173)
                                                Phone: (202) 961-9446
13                                              Email: narrivo@humanesociety.org

14                                              The Humane Society of the United States
                                                1255 23rd Street, NW, Suite 450
15                                              Washington, DC 20037

16                                              *Admitted Pro Hac Vice*

17                                              *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

36

**Case No. 4:20-cv-00461-JGZ**

**List of Exhibits Submitted in Support of Plaintiffs' Motion for Summary Judgment**

<u>Exhibits Filed with Plaintiffs' Motion for Summary Judgment</u>

1.  Declaration of Ian Michler ("Michler Decl.") (Exhibit 1) (ECF No. 63-1)

2.  Declaration of Brett Hartl ("Hartl Decl.") (Exhibit 2) (ECF No. 63-2)

3.  Declaration of Iris Ho ("Ho Decl.") (Exhibit 3) (ECF No. 63-3)

4.  Declaration of Heidi Osterman ("Osterman Decl.") (Exhibit 4) (ECF No. 63-4)

5.  Declaration of Teresa Telecky ("Telecky Decl.") (Exhibit 5) (ECF No. 63-5)

6.  Declaration of Kara Clauser ("Clauser Decl.") (Exhibit 6) (ECF No. 63-6)

<u>Exhibits Filed with Plaintiffs' Summary Judgment Opposition and Reply</u>

7.  Declaration of Margaret Robinson ("Robinson Decl.") (Exhibit 7)

8.  Second Declaration of Kara Clauser ("2d Clauser Decl.") (Exhibit 8)

9.  Supplemental Declaration of Iris Ho ("Ho Supp. Decl.") (Exhibit 9)

10. Supplemental Declaration of Ian Michler ("Michler Supp. Decl.") (Exhibit 10)

11. Supplemental Declaration of Brett Hartl ("Hartl Supp. Decl.") (Exhibit 11)

12. Supplemental Declaration of Heidi Osterman ("Osterman Supp. Decl.") (Exhibit 12)