**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Debra Haaland, et al.,<br><br>Defendants. | No. CV-20-00461-TUC-JGZ<br><br>**ORDER** |

Pursuant to the Endangered Species Act (ESA) and Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the United States Fish and Wildlife Service (the Service) issues permits to individuals for the importation of animal trophies[1] from overseas sport hunting. In the litigation at hand, Plaintiffs Center for Biological Diversity, Humane Society International, Humane Society of the United States, and Ian Michler, challenge the Service's authorization of permits to import sub-Saharan African leopard trophies from hunts in Tanzania, Zambia, and Zimbabwe. (*See* Docs. 73 at 11 n.2; 73-1, ¶¶ 8-9.) The Court permitted Safari Club International (SCI) to intervene as a Defendant, (Doc. 22), but denied its motion to dismiss the complaint, concluding Plaintiffs had sufficiently alleged standing. (Doc. 41 at 4-6, 9-12.) The Court also denied the Service's motion to dismiss the complaint for lack of standing for similar reasons. (Doc. 24.)

---

[1] A sport-hunted trophy is "a whole dead animal or a readily recognizable part or derivative of an animal specifically identified on accompanying [documentation]." 50 C.F.R. § 23.74.

Pending before the Court are the parties' motions and cross-motions for summary judgment. (Docs. 63, 67, 68.) Plaintiffs argue that over a two-and-a-half-year period,[2] the Service acted arbitrarily and capriciously by granting leopard trophy import permits, which allowed American hunters to import their leopard trophies into the United States after hunting and killing the animals abroad. (*See* Doc. 63 at 20-21.) Defendants renew their argument that Plaintiffs lack standing to sue, and they also challenge Plaintiffs' arguments on the merits. (*See* Docs. 67-68.) The motions are fully briefed. (Docs. 63, 67-68, 73-75.) For the reasons that follow, the Court will deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motions for summary judgment on the ground that Plaintiffs fail to demonstrate standing.

## BACKGROUND

### I. Legal Framework for Issuance of Permits

The Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) is a multilateral treaty signed on behalf of the United States that regulates the international trade of imperiled species. 27 U.S.T. 1087. CITES is incorporated into domestic law through the ESA and is implemented by the Service through regulations. 16 U.S.C. §§ 1531-1544; 50 C.F.R. §§ 23.1-23.92.

CITES lists the species subject to its provisions in three appendices, "each of which provides a different level of protection and is subject to different requirements." 50 C.F.R. § 23.4. The leopard (Panthera Pardus) is listed in Appendix I. 50 C.F.R. § 23.91; CITES Appendices, available at https://www.cites.org/eng/app/appendices.php (last visited Sept. 27, 2023). Under the CITES implementing regulations, it is generally unlawful for a person to import "any specimen of a species listed in Appendix I." 50 C.F.R. § 23.13(a). However, an individual may import an Appendix-I species by obtaining an import permit from the Service. *Id.* §§ 23.20(e), 23.35.

Before issuing an import permit for an Appendix-I specimen, the Service must find

---

[2] The challenged permits were issued between March 18, 2020, and August 31, 2022. (*See* Doc. 73-1, ¶ 8.) Six are for Tanzania, two for Zambia, and eight for Zimbabwe. (*Id.*)

that the proposed import permit "would be for purposes that are not detrimental to survival of the species." *Id.* § 23.35(c)(1). This determination is known as a "non-detriment" finding or "NDF." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1284 (D.C. Cir. 2016). Section 23.61 outlines the factors that the Service must consider in making NDFs and provides that the non-detriment finding must be based on "the best available biological information," among other factors. *Id.* § 23.61(c), (e), (f). The regulations further provide that "[i]n cases where insufficient information is available or the factors [ ] are not satisfactorily addressed, [the Service must take] precautionary measures and would be unable to make the required finding of non-detriment." *Id.* § 23.61(f)(4).

## II.   Plaintiffs' Claims

On summary judgment, Plaintiffs challenge sixteen of the Service's NDFs and associated import permits for leopard trophies from hunts in Tanzania, Zambia, and Zimbabwe. (Docs. 73 at 11 n.2; 73-1, ¶¶ 8-9.) Plaintiffs contend that the Service violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706, by making unsubstantiated NDFs prior to issuing leopard trophy import permits. (*See* Doc. 10, ¶¶ 271-89.) Plaintiffs allege the Service acted arbitrarily, capriciously, and contrary to law in making these NDFs because it: (i) failed to consider whether the exporting country has a "a biologically based sustainable-use management plan[ ] that protects [leopards] against over-utilization;" or, if no such plan exists, whether "the "removal[ ] will [ ]not contribute to the over-utilization of the [leopard] considering both domestic and international uses;" (ii) failed to consider "the best available biological information;" and (iii) lacked sufficient information to "determine whether overutilization, sustainable use, and net harm is occurring to the [leopard]." (*Id*.)

## APPLICABLE LAW

The Administrative Procedure Act governs judicial review of agency action. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003). It requires a reviewing court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious when "the agency relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (cleaned up). Agency action is valid if a reasonable basis exists in the administrative record for the agency's decision. *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).

In a case involving review of final agency action under the APA, the Court's role is limited to reviewing the administrative record, *Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012), and it generally need not perform any fact-finding, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). At the summary judgment stage, the court need only determine whether "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (cleaned up). When cross-motions for summary judgment are filed, the court must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015).

## DISCUSSION

The Court has an obligation to assure that standing exists before it addresses the merits of a dispute. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). Standing is comprised of three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id*. at 560-61 (cleaned up). As the

party invoking federal jurisdiction, the plaintiff bears the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element of Article III standing." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023). A plaintiff's failure to support any one of the necessary elements of the standing requirement, may result in the action's dismissal. *Id.* Here, Plaintiffs fail to meet their burden with respect to the causation and redressability elements.

## I. Impact of Regulated Third Party

When the plaintiff is not himself the object of the government action he challenges, standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (cleaned up). Thus, where causation and redressability hinge on the response of a regulated third party to the government action—and perhaps on the response of others as well, it becomes Plaintiffs' burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* In other words, in third-party causation cases, Plaintiffs must identify facts showing "that [the] third parties will likely react in predictable ways." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F. 4th 997, 1018 (9th Cir. 2021) (quoting *California v. Texas*, 141 S. Ct. 2104, 2117 (2021)).[3]

---

[3] Plaintiffs cite *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014), and *WildEarth Guardians v. Provencio*, 923 F.3d 655, 667-68 (9th Cir. 2019), for the propositions that when "government action cause[s] injury by influencing the conduct of third parties," a plaintiff need only show "the government's unlawful conduct 'is at least a substantial factor motivating the third parties' actions," and that "it is sufficient that 'a defendant is at least *partially* causing the alleged injury.'" (Doc. 73 at 19.) Neither *Mendia* nor *Provencio* suggest that Plaintiffs' burden is so minimal. In *Mendia*, the court required the plaintiff "to offer *facts* showing that the government's unlawful conduct 'is at least a substantial factor motivating the third parties' actions . . . without relying on 'speculation' or 'guesswork' about the third parties' motivations." 768 F.3d at 1013 (emphasis added). The court explained that "when a plaintiff alleges that government action caused injury by influencing the conduct of third parties, . . . more particular facts are needed to show standing . . . because the third parties may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct." *Id*. (cleaned up). In *Provencio,* the court rejected SCI's redressability argument that plaintiffs lacked NEPA

## II. Causation

Plaintiffs argue that their injuries are caused by and fairly traceable to the Service's actions because, for many hunters, importing a trophy substantially motivates their decision to go on a hunt. (Docs. 63 at 21-22; 73 at 19.)[4] To substantiate this contention, Plaintiffs rely on declarations filed in a 2014 case, from American elephant hunters, some of which state that if the hunter could not import his elephant trophy from Tanzania or Zimbabwe, he would not hunt the animal, and declarations from hunting outfitters attesting to clients canceling their elephant hunts under these circumstances. (Docs. 63 at 22; 73 at 19; *see also Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 31 (D.D.C. 2014).) Plaintiffs also point to a statement on the Service's website that says "most hunters want to know before their hunt whether they qualify for a permit to import their hunted animal." (Doc. 73 at 19.) In addition, because *all* of the applications for import permits indicate that the sport hunters applied for a permit before their hunt, Plaintiffs argue that the ability to import a trophy must have factored into their decision to hunt. (Doc. 73 at 19.)

Plaintiffs' central premise—that U.S. hunters will not hunt leopards if they cannot

---

standing because their own activities could cause the very same impact they sought to prevent, reiterating that "the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury." 923 F.3d at 668 (citation omitted). The court did not discuss causation or discuss the showing required when a plaintiff's claim depends on the response of a regulated third party to the challenged government action. *Id.*

[4] Plaintiffs assert that the Court accepted this theory of causation in denying Defendants' motions to dismiss (*see* Docs. 24, 41), relying on their "evidence that U.S. hunters will not hunt if they cannot import their trophies." (Doc. 73 at 19; *see also* Doc. 63 at 21.) While it is true that the Court ruled that Plaintiffs' complaint sufficiently *alleged* that the Service's authorization of trophy-import permits caused injury to their interest in observing leopards in the wild, (Docs. 24 at 4; 41 at 11), the Court explained that to resolve Defendants' facial attack on the complaint, it was required to treat the factual allegations in the complaint as true "at [that] stage" of the proceedings. (Docs. 24 at 3; 41 at 5.) At summary judgment, however, Plaintiffs must support each element of standing in the same way as any other matter on which the plaintiff bears the burden of proof. *Lujan*, 504 U.S. at 561. The Plaintiffs can no longer rely on mere allegations but must proffer by affidavit or other evidence specific facts that will be taken as true to demonstrate standing to sue. *Id.*

import their trophies, and the suggestion that importing a trophy substantially motivates hunters' decisions to hunt leopards, is not borne out by the evidence. Here, as many as thirteen of the twenty-three leopard hunters whose import permit applications were initially challenged (over 56%), went on their hunts without a permit in hand. (*See* Docs. 68 at 19; 68-1 at 4-7.) This evidence demonstrates that import permits are not a prerequisite to hunting leopards, which is what Defendants contend. (*See* Doc. 68 at 19.) And Plaintiffs do not refute this conclusion with evidence showing that any leopard hunter cancelled their hunt because a permit was not issued prior to the hunt, or that any of the hunters would have cancelled if the Service did not first issue a permit.

The evidence showing that leopard hunters continued to hunt without a permit calls into question the persuasiveness of the Service's website statement that "most hunters want to know before their hunt whether they qualify for a permit." (Docs. 63 at 22; 73 at 19.) While hunters may want to know whether they qualify for a permit pre-hunt, the issuance of the permit is not a precondition to hunt leopards and, as the evidence demonstrates, hunters continued to hunt leopards even in the absence of obtaining an import permit.

Similarly, the fact that *all* of the hunters applied for an import permit pre-hunt is insufficient to show that the ability to import a trophy factored heavily in the hunters' decisions to hunt in the first place. Again, the evidence in the record shows that the hunters' interest in importing a leopard trophy was not determinative of their decision whether to hunt leopards because a majority of the hunters hunted and killed leopards even in the absence of receiving a pre-hunt permit. (*See* Doc. 68-1 at 4-7.)

Plaintiffs fail to offer persuasive arguments and evidence to refute Defendants' substantiated contention that leopard hunters are not predictably affected by the absence of trophy import permits. (*See* Doc. 73 at 20-23.) The elephant hunt declarations are outdated, inapplicable, and unpersuasive. (*See id*. at 21-22.) The evidence shows that *leopard* hunters were not, in the majority of cases, dissuaded by the lack of import permits. Moreover, the process for issuing elephant permits in 2014 is distinctly different from the one at issue in this case in 2023.

In *Safari Club International v. Jewell*, the Service suspended *all* imports of sport-hunted elephant trophies taken from Zimbabwe in 2014 because available data indicated a significant decline in the elephant population. 213 F. Supp. 3d 48, 55 (D.D.C. 2016), *aff'd in part, rev'd in part sub nom. Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017). Unlike *Safari Club*, this case does not involve elephant trophies or a complete prohibition on the import of leopard trophies that might prompt leopard hunters to profess that they may not go hunting. Additionally, since the resolution of *Safari Club*, the Service now determines import permit applications on a case-by-case basis rather than using a countrywide approach. *Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 168 (D.D.C. 2019). As a result, denial of one permit no longer guarantees denial of all permits from a particular country, and the same is true for granting permits. Thus, hunters assume an individual risk of non-importation every time they book a hunt for a species that requires an import permit. Even if one hunter's import permit application for a leopard is denied, it is unpredictable whether other leopard hunters would cancel their hunt for fear of not being able to import a trophy. And, unlike the 2014 elephant hunts, there is no evidence that any of the leopard hunters cancelled their hunt because a permit was not issued prior to the hunt or that any of the hunters would have cancelled if the Service did not first issue a permit.

Plaintiffs cite *Cary v. Hall*, No. C 05-4363 VRW, 2006 WL 6198320, at *6 (N.D. Cal. Sept. 30, 2006), as support for their claim that, because "trophies are the end goal of sport hunters, it would be fair to recognize a causal connection between legalizing their importation and plaintiffs' injury." (Doc. 73 at 19 (cleaned up).) But *Cary* did not involve importation permits and the case does not support Plaintiffs' theory of causation. To the contrary, the *Cary* court found the environmental plaintiff's causation theory to be "too speculative" and "unquestionably reli[ant] on the unfettered decisions of third parties." 2006 WL 6198320, at *7. The court's reference to importation permits was dicta, when the court hypothesized that *if* there was evidence of sport hunters' motives to import, causation might be found. *Id*. The court stated:

> Although more indirect, causation would not be *implausible* if the exemption allowed the importation into the United States of trophies of the three antelope species taken in the wild. *For accepting as true* plaintiffs' allegation that such trophies are the end goal of sport hunters, it would be fair to recognize a causal connection between legalizing their importation (which would otherwise be illegal) and [plaintiff's] injury.

*Id.* (emphasis added). Here, the parties are well past the pleading stage and the Court need not accept Plaintiffs' allegations as true. Instead, Plaintiffs must submit persuasive evidence to support their causation theory, which the Court finds they fail to do.

Lastly, Plaintiffs challenge Defendants' evidence that hunters killed leopards without import authorization. Plaintiffs argue that Defendants' evidence is based on a deviation caused by pre-filing, pandemic-spurred government permitting delays and post-filing unilateral delays. (Doc. 73 at 20.) According to Plaintiffs, after they sued, the median number of days for the Service to issue a permit increased by more than ten times (from 26 days to 295 days). (*Id.*) Plaintiffs contend that "[s]uch unilateral actions that occur after litigation commences and that appear designed to insulate a decision from review[,] must be reviewed with a critical eye,"[5] and that it was reasonable for hunters to assume the government would act with regularity and timely issue import authorizations. (*Id.* (cleaned up).) Plaintiffs emphasize that they never argued that *all* hunters in this case applied to import their trophies prior to their scheduled hunts, and they suggest that the applicants who apply pre-hunt have no reason to be concerned their permits will be denied

---

[5] Plaintiffs assert that they filed this action and then the Service began taking substantially more time to issue permits, suggesting the two events were related. This assertion rests on a post hoc logical fallacy, assuming a causal relationship from the two events based on their chronological order. What is more, Plaintiffs base their time calculations on only 20 permits, (Doc. 73-1 ¶ 19), even though the Service receives more than 5,000 permit applications a year, many of which are considered backlogged, (Doc. 74 at 14). Plaintiffs' interpretation of its data does not account for the possibility that there may be a widespread reason for general permitting delays within the Service—a reason unrelated to this lawsuit and unrelated to leopard trophy importation. For these reasons, the Court rejects Plaintiffs' implication that the Service imposed unilateral delays to insulate its decision from Court review.

because permits were issued for every applicant unless they withdrew their application or failed to provide requested information. (*Id*. at 19-20.)

Even assuming the Service arbitrarily or capriciously issued the 16 permits still in dispute, (*see* Docs. 73 at 11 n.2; 74 at 8 n.3), Plaintiffs' causation theory, fully extended, depends on the "unfettered choices" of independent actors whose decisions the Court can neither presume nor predict, *Lujan*, 504 U.S. at 562. First, Plaintiffs would have to show that a ruling in their favor from this Court would somehow be communicated to independent actors—officials in Tanzania, Zambia, and Zimbabwe; officials in other countries with many trophy hunters; or to U.S. trophy hunters. Next, Plaintiffs would have to show that, upon receipt of this information, these independent actors might change their behavior. That is, officials in Tanzania, Zambia, and Zimbabwe might modify their policies on the hunting of leopards because this Court found that the Service unlawfully issued 16 permits. Or Plaintiffs would need to show that officials in other countries would find this Court's ruling on 16 permits so persuasive that they would change their national policy on leopard trophy importation. Or Plaintiffs would need to show that this Court's decision on 16 permits would deter a significant number of U.S. trophy hunters from not just importing leopards but also killing them for sport.

Even after establishing at least one of those three paths, Plaintiffs would still need to prove that a change in the behavior of these independent actors would, in the aggregate, decrease leopard trophy hunting. For instance, Plaintiffs would need to show that officials in Tanzania, Zambia, and Zimbabwe would modify their policies to protect leopards rather than lessen regulations to attract more trophy hunters. Or they would need to show that trophy hunters from other countries would not replace a dwindled demand from U.S. trophy hunters. Finally, Plaintiffs would have to end their causal theory by establishing that less leopard trophy hunting in Tanzania, Zambia, and Zimbabwe would in fact prevent an injury to their aesthetic or recreational interests.

Plaintiffs have not bet their burden of showing the likelihood of these causal links. The Court can neither presume nor predict how officials in other countries and trophy

hunters from around the world would act based on a ruling that the Service issued 16 leopard import permits arbitrarily. Nor can the Court speculate as to whether the decisions of these independent actors would lessen the demand for leopard trophy hunting and preserve Plaintiffs' aesthetic and recreational interests in viewing the leopard when they travel to Tanzania, Zambia, or Zimbabwe.

In sum, Plaintiffs have not adduced facts demonstrating that foreign officials and leopard hunters will likely react in predictable ways. *See Whitewater Conservation Dist.*, 5 F. 4th at 1018. "If the facts make a claim implausible, the non-movant must present more persuasive evidence than would otherwise be necessary … to defeat a summary judgment motion." *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995), *as amended* (May 26, 1995) (cleaned up). Plaintiffs fail to present persuasive evidence to outweigh the implausibility of their theory on causation.

## III. Redressability

In addition to causation, Plaintiffs fail to demonstrate redressability. While "[r]edressability does not require certainty," *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013), it does require that plaintiff show "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Yazzie v. Hobbs,* 977 F.3d 964 (9th Cir. 2020) (cleaned up). Plaintiffs argue that a favorable ruling invalidating the challenged permits would redress their injuries "by deterring U.S. trophy hunters—who account for a majority of worldwide imports of leopard trophies—from hunting leopards, and by spurring exporting countries to improve their management practices." (Doc. 63 at 22.) Plaintiffs cannot predict, with any degree of accuracy, that an invalidation of the challenged leopard-import permits would deter U.S. trophy hunters from killing leopards abroad, or affect the independent determinations of the third-party countries who offer them up for sport, and therefore enhance their aesthetic interest in viewing sub-Saharan leopards in the wild. The evidence does not predictably support any of these desired outcomes.

A decision to invalidate these permits would likely have no legal impact on the decisions of Tanzania, Zambia, and Zimbabwe to reduce their hunting quotas and disallow

hunters from other parts of the world to come and kill leopards, whether or not those hunters choose to import their leopard trophy back home. A decision to invalidate these permits would not likely dissuade American hunters from killing leopards in sub-Saharan Africa. The evidence in this case shows that most American hunters will continue to kill leopards in sub-Saharan Africa even in the absence of an import permit.

Because Plaintiffs' lack of standing at this stage is conclusive, the Court does not reach the merits.

## CONCLUSION

For the foregoing reasons,

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 63) is DENIED and Defendants' Cross-Motions for Summary Judgment (Docs. 67-68) are GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike New Evidence and Arguments Made on Reply (Doc. 76) is DENIED as moot.[6]

The Clerk of Court is instructed to close this case.

Dated this 29th day of September, 2023.

_____
Jennifer G. Zipps
United States District Judge

---

[6] In Plaintiffs' Motion to Strike, they ask that the Court strike, and not consider, new evidence and arguments included in Defendants' replies. (Doc. 76.) As the Court did not consider any newly-presented evidence in resolving the motions for summary judgment, the Court will deny the Motion to Strike as moot.

- 12 -